## In. re Alker, Jr.

Before Klein, P. J., Bolger, Lefever and Shoyer, JJ.

*Henry T. Reath,* as amicus curiae and for Committee of Censors of the Philadelphia Bar Association.

*Berger, Stein & Kline,* and *Stradley, Ronon, Stevens & Young,* for respondent.

PER CURIAM, March 9, 1959.—On February 11, 1959, this court sua sponte filed a preliminary statement ordering a citation to issue, directed to Harry J. Alker, Jr., to show cause why he should not be disciplined. On February 27, 1959, an answer was filed by respondent.

A hearing was held before us on March 6, 1959, at which respondent appeared in person and was represented by counsel.

At this hearing evidence was introduced which clearly established: (1) That respondent was twice

convicted of criminal charges by juries in the United States District Court for the Eastern District of Pennsylvania; (2) that said crimes involved willful fraud and moral turpitude; (3) that respondent was guilty of other conduct in violation of the Canons of Professional Ethics and inimical to the public interest; and (4) that respondent was duly disbarred from practice before the Treasury Department of the United States.

It is our unanimous opinion that the evidence presented in this case leads to the inescapable conclusion that respondent, Harry J. Alker, Jr., is unfit to be a member of the bar of this court. An opinion setting forth more fully our reasons for reaching this conclusion will be filed in due course.

Therefore we enter the following

### Decree

And now, March 9, 1959, it is ordered and decreed that Harry J. Alker, Jr., be and is hereby disbarred from practice in this court and that his name be stricken from the roll of attorneys.

### Opinion

KLEIN, P. J., April 17, 1959.—We always undertake with grave concern and great reluctance the matter of deciding whether we shall strike the name of an attorney from the roll of the members of our bar. This is specially true when, as in the present case, the lawyer is a man of advanced age and has practiced his profession for a great many years. Fortunately, we are rarely compelled to perform this unpleasant duty.

In the present case, however, the proof of the misconduct of Harry J. Alker, Jr., respondent, is clear, preponderant and convincing. The facts are uncontradicted. He manifestly used the experience he acquired as an attorney not only to debase his profession but also to deceive the courts, of which he was an officer, and to betray the interests of his clients. He has been convicted twice of criminal charges by juries in the

United States District Court for the Eastern District of Pennsylvania, and is now confined in prison at Lewisburg for these offenses.

Harry J. Alker, Jr., was indicted by a Federal grand jury on April 11, 1955, on four counts under 26 U. S. C. A. §145 (b), 53 Stat. 62, for willfully and knowingly attempting to evade and defeat income taxes due by him for the calendar years 1947 to 1950, inclusive, by filing false and fraudulent tax returns, thereby violating the Internal Revenue Code, and was found guilty on all four counts on September 26, 1956, by a jury before Hon. George S. Register (on special assignment from the District of North Dakota) after a trial which lasted 21 days.

The trial judge imposed a sentence of one year and one day and a fine of $10,000 on each of the first three counts, the sentences of imprisonment to run concurrently. On the fourth count the court imposed a sentence of three years to run consecutively with the sentence on the first three counts. On this count sentence was suspended and defendant placed on probation. An appeal was taken to the United States Court of Appeals for the Third Circuit, which affirmed the action of the district court on September 10, 1958. A petition for writ of certiorari was denied by the Supreme Court of the United States on February 24, 1959.

The following facts were developed at the trial: During the years 1947, 1948, 1949 and 1950, respondent had received income vastly in excess of what he reported on his Federal income tax return. This income was realized from legal fees, director's fees, dividends and interest. In 1949 and 1950, he also had small capital gains. Except for 1947, small losses from certain rental properties were claimed and allowed. Taking all these items into account, and subtracting therefrom all the deductions and exemptions claimed by respondent, it was shown that he had evaded $178,-

998.57 in taxes over the course of four years on unreported income of $341,784.95. The following chart, found in the opinion of the Court of Appeals (United States v. Alker, 260 F. 2d 135, 141), gives a breakdown by years of respondent's unreported income and tax evasion:

Net Income

| Year | Reported | Corrected | Additional |
|------|----------|-----------|------------|
| 1947 | ($11,238.54)* | $ 79,450.88 | $ 90,689.42 |
| 1948 | (10,204.29) | 46,968.85 | · 57,173.14 |
| 1949 | 14,975.77 | 20,171.37 | 5,195.60 |
| 1950 | (27,512.02) | 161,224.77 | 188,736.79 |
| Totals | ($33,979.08) | $307,815.87 | $341,794.95 |

Tax Liability

| Year | Reported | Corrected | Additional |
|------|----------|-----------|------------|
| 1947 | — | $ 46,131.71 | $ 46,131.71 |
| 1948 | — | 20,900.71 | 20,900.71 |
| 1949 | $3,643.11 | 5,888.57 | 2,245.46 |
| 1950 | — | 109,720.69 | 109,720.69 |
| Totals | $3,643.11 | $182,641.68 | $178,998.57 |

* ( ) indicates loss.

The component figures from which the income chart was prepared were obtained from respondent's own books, from statements and schedules prepared by respondent in the handling of various estates and from testimony of clients who had paid respondent legal fees. Indeed, in his brief filed in support of his appeal, he conceded that the income figures which appear above are substantially correct.

In his 1947 return, he declared that he had filed a return for 1946, when, in fact, he had not done so. He did not file returns for 1949 and 1950 until he knew an investigation of his returns was under way. Alker's own books clearly reflected the undisclosed amounts and established that he consistently understated his

income in substantial amounts. That he intentionally and willfully understated his income for the express purpose of defrauding the United States of income taxes which he owed can hardly be doubted by any reasonable person.

Respondent was again indicted by a Federal grand jury on March 8, 1956, on three counts, charging him with:

"1. Willfully and knowingly attempting to evade and defeat a large part of the estate taxes imposed upon the Estate of Winfred S. Hurst, deceased, by filing a false and fraudulent estate tax return, wherein the cash on hand was grossly understated—in violation of 26 U. S. C. 894 (b) (2) (c) (I. R. C. 1939).

"2. Of presenting to representatives of the Secretary of the Treasury, on April 7, 1955, certain documents known by Alker to be false and fraudulent as to material matters relating to said Estate—in violation of 26 U. S. C. 7207 (I. R. C. 1954).

"3. Of presenting to representatives of the Secretary of the Treasury, on April 29, 1955, certain documents known by Alker to be false and fraudulent as to material matters relating to said Estate—in violation of 26 U. S. C. 7207 (I. R. C. 1954)."

Alker was found guilty on all three counts on April 8, 1957, by a jury before Hon. C. William Kraft, Jr., after a trial which lasted 11 days. On September 19, 1957, he was sentenced to imprisonment for six months, on each of the three counts, all sentences to run concurrently, and fines of $8,000, on count one, and $1,000, on each of counts two and three, were imposed.

An appeal was taken to the United States Court of Appeals for the Third Circuit, which on May 15, 1958, confirmed the judgment and commitment of the district court as to count one. After the appeal was filed,

but before argument was heard, the Government agreed to dismiss counts two and three for policy reasons which had no bearing on the underlying facts of the case.

A petition for a writ of certiorari was denied by the Supreme Court of the United States. At present a motion for a new trial, based upon alleged newly discovered evidence, is pending in the United States District Court.

The following facts were developed at the trial of this case: Alker acted as executor and trustee, as well as counsel, for the estate of Winfred S. Hurst, who died November 7, 1949. On November 8, 1949, respondent and four of the beneficiaries under decedent's will met in decedent's office. Respondent opened decedent's safe and removed therefrom seven packages of money totaling $35,000, which he took with him. This fact was verified by three of the beneficiaries present at the time.

On February 5, 1951 respondent filed a Federal estate tax return for the estate in which the $35,000 was not included as an asset of the estate and a fictitious debt of $3,000 was listed.

Alker thereupon embarked upon a persistent course of lies and deceit to cover up his fraudulent failure to include the $35,000 as an asset of the estate in his tax return. He completely shifted his position on several occasions, changing one story for another in his dealings with the Federal revenue agents. In 1954 he filed a petition with the United States Tax Court, wherein he averred that the money in the envelopes had been distributed to the named persons by Carpenter, who had been an employe of Hurst and later of respondent. Carpenter denied that the money was in the envelopes or that he had distributed any of it, and the alleged distributees denied that they had received

any of the money or that there were any reasons why they should have received any of it.

Respondent also produced certain memoranda, upon which he claimed he relied in making distribution and which he alleged were signed by decedent. The authenticity of these memoranda had previously been questioned during the course of the administration of the Hurst estate. Alker's counsel and counsel for the legatees agreed to submit these documents to Norris V. McCool, an impartial handwriting expert, who had been mutually selected by counsel for both sides. Mr. McCool appeared as a witness at the audit of Alker's account in the Orphans' Court of Montgomery County and branded the questioned documents as crude forgeries. In spite of this, respondent represented to the revenue agents that these documents were genuine.

There cannot be the slightest doubt that Alker was properly convicted for his criminal conduct in knowingly, willfully and deliberately attempting by fraud and deceit to cheat the United States Government of Federal estate taxes to which it was justly entitled under the law.

The law with respect to the disbarment of lawyers convicted of crimes differs greatly in the several States. In some it appears necessary to establish that the crime involves moral turpitude to justify disbarment. Moral turpitude, however, is a term of inexact meaning, subject to varying interpretations.

Although some courts have concluded that moral turpitude is not necessarily an essential element of prosecution for filing fraudulent returns with intent to cheat the Federal Government of taxes, the weight of authority, and in our opinion the better view, holds to the contrary.

In Jordon v. De George, 341 U. S. 223, 71 S. Ct. 703 (1952), the Supreme Court held that conspiring to defraud the United States of taxes on distilled

spirits was a "crime involving moral turpitude" requiring deportation of an alien convicted thereof. In Chanan Din Khan v. Barber, 147 F. Supp. 771 (1957), the court ruled that fraud is so inextricably woven into the term willfully, as it is employed in section 145(b), that it is clearly an ingredient of the offense proscribed by that section.

George D. Haller of the Michigan bar, in an excellent article entitled "Evading Income Taxes: Moral Turpitude?", Michigan State Bar Journal, March 1958, said:

"All the federal cases agree that where an indictment is brought charging that 145(b) was violated by the filing of a false and fraudulent return, it is an essential element of the government's case, to obtain a conviction that fraud must be proved." (Borra v. United States, 351 U. S. 131, 100 L. Ed. 1013, 76 S. Ct. 685; Achilli v. United States, 353 U. S. 373, 1 L. Ed. 2d 918, 77 S. Ct. 995; United States v. Rosenblum, 176 F. 2d 321; United States v. Ranb, 177 F. 2d 312; Merritt v. United States, 195 F. 2d 127).

"If thus, the defendant is so charged, fraud is thereby made a part of the crime, and resultant conviction seals the content of the offense so as to integrate it within the scope of moral turpitude."

Indeed, the weight of authority is to the effect that conviction under section 145(b) alone is sufficient cause to justify disbarment. Thus the Supreme Court of Washington, in In re Seijas, 51 Wash. 2d 900, 318 P. 2d 961 (1957), decided that conviction, under an indictment charging a willful and knowing attempt to defeat and evade income taxes by filing false and fraudulent income tax returns involved "moral turpitude" and warranted defendant's disbarment by summary procedure. See also In re DePuy, 10 N. J. 282, 90 A. 2d 19 (1952) ; Rheb v. Bar Association of

Baltimore City, 186 Md. 200, 46 A. 2d 289 (1946);
In the Matter of Kafes, 17 N. J. 212, 111 A. 2d 64
(1954); People v. Fischer, 132 Colo. 131, 287 P. 2d
973 (1955).

In Pennsylvania we have never adopted the so-called
"moral turpitude" rule. In Griffin Appeal, 371 Pa. 646
(1952), respondent was convicted of conspiracy to
defraud the United States in the issuance of passports.
He contended that he should not be disbarred because
his offense did not involve moral turpitude. The Su-
preme Court rejected this contention and said at page
650:

"With regard to the question of moral turpitude,
no doubt there are improper acts performed by attor-
neys, for which the law requires disbarment, that may
not come within a strict definition of moral turpitude
which is defined as baseness or depravity. But here we
doubt that we are much concerned with nice distinc-
tions or definitions and in any case we think the re-
spondent's actions do amount to baseness and de-
pravity."

No strict technical rule has ever been adopted in
this State. Our rule is one of common sense and each
case is judged on its own circumstances. The true test
in a disbarment proceeding is whether the attorney's
character, as shown by his conduct, makes him unfit
to practice law from the standpoint of protecting the
public and the courts. The disbarment of an attorney
is, like his admission, a judicial act, based upon due
inquiry into his fitness for the office.

In Chernoff's Case, 344 Pa. 527 (1952) the court
said at page 533:

"In Wolfe's Disbarment [288 Pa. 331], we cited
with approval this language from the opinion of the
Supreme Court of the United States in Wall's Case,
107 U. S. 265 (p. 336): 'The proceeding [to disbar]

is in its nature civil, and collateral to any criminal proceeding by indictment. The proceeding is not for the purpose of punishment but for the purpose of preserving the courts of justice from the official ministrations of persons unfit to practice in them."

In Pennsylvania, when a lawyer has been convicted of a crime, it has uniformly been regarded as cause for disbarment. For examples in which such convictions resulted in disbarment see In re Gottesfeld 245 Pa. 314 (1914), in which an attorney was convicted in a Federal court of conspiracy to conceal assets from a trustee in bankruptcy; In Griffin Appeal, supra, in which respondent, who was a United States Commissioner, was convicted of conspiracy to defraud the United States in the issuance of passports; Wolfe's Disbarment, 288 Pa. 331 (1927), in which an attorney was conducting a pawnbroker's business, in the course of which he was convicted of receiving stolen goods but pardoned before he completed his term of imprisonment. See also Margolis' Case, 269 Pa. 206 (1921), in which respondent was an active member of an organization which urged men, in violation of a Federal statute, not to enlist in the armed forces. Although not arrested for the offense, in its opinion affirming his disbarment, the Supreme Court said on page 211: "If the respondent had been convicted of a violation of the statute, there can be no doubt of his forfeiture of his rights as an attorney: In re Kerl, 188 Pac. 40; In re Hofstede, 31 Idaho 448."

Moreover, it is well settled in this State that even acquittal of the crime charged does not preclude disbarment action when deemed appropriate. In Wolfe's Disbarment, supra, the Supreme Court said at page 337:

"Acquittal of a criminal charge in Pennsylvania is no defense to actions where the misconduct under investigation shows unfitness of the attorney to be en-

trusted with the powers and obligations of his profession."

See also In re Davies, 93 Pa. 116 (1880), in which a lawyer accused of embezzling a $100 bond from a client, was disbarred in spite of the fact that the case was settled and the criminal charges dropped, Barach's Case 279 Pa. 89 (1924) in which a lawyer was disbarred although acquitted of the charge of soliciting bribes and extortion while employed as a detective in the coroner's office.

Alker was an experienced lawyer, well versed in matters pertaining to taxes and administration of the estates of decedents. We are completely satisfied that he was convicted properly of attempting to defraud the Federal Government of income taxes owed by him personally, as well as estate taxes in the Hurst Estate, which was in his charge as fiduciary. Each of his offenses was, by its nature, crimen falsi, involving employment of falsehood in order to injuriously deprive the United States of revenue to which it was lawfully entitled, and was therefore an infamous offense which necessitates his disbarment. See In re Gottesfeld, supra.

We are fortified in our conclusion that respondent, Harry J. Alker, Jr., is an unfit person to continue in the high profession of attorney, by our study of the record in the suit started against him by Girard Trust Corn Exchange Bank and Florence Fisher Dunwoody, executors under the will of Mamie DuBan, deceased, in the Court of Common Pleas No. 1 of Philadelphia County, March Term, 1954, no. 973, tried before Mac-Neille, P. J. of Common Pleas No. 3.

The record in the DuBan case, which was incorporated into the record of the present proceedings, reveals that Alfred A. DuBan had been a close and intimate friend of Alker for many years prior to his death,

which occured in 1938, during which period Alker had also been his legal counsel. DuBan's widow, Mamie DuBan, was the sole legatee and beneficiary under his will. During his lifetime, DuBan loaned Alker, from time to time, 4,400 shares of the common stock of National Dairy Products Corporation, which was deposited by Alker as collateral for a loan owed by himself to the Integrity Trust Company of Philadelphia. DuBan loaned the stock upon Alker's promise to return it, upon demand. This undertaking was evidenced by written receipts signed by Alker. None of the stock was returned to DuBan in his lifetime and his claim was transferred to his widow in the settlement of his estate. Following DuBan's death, Alker returned 2,475 shares of the stock to Mamie DuBan, so that when she died in 1953, Alker owed her a balance of 1,925 shares of the stock.

As a defense, in resisting the claim of Mrs. DuBan's executors, Alker contended that the DuBans were indebted to him in the sum of $50,615.40, of which $30,000 was for counsel fees, and that Mamie DuBan had agreed that, in consideration of Alker's waiving his claim for the debt due him and paying her an amount equal to the dividends she would have received on the unreturned stock so long as she lived, upon her death any further obligation by Alker to return the stock in question would terminate.

Judge MacNeille was unimpressed with the testimony of Alker's witnesses and entered judgment against him on July 10, 1956, in the sum of $143,-876.42, which judgment remains unpaid and unsatisfied. In his opinion sur exceptions to findings of court, Judge MacNeille said:

"We are of the opinion that defendant (Alker) has deliberately and improperly delayed the disposition of this case; that he has used various devices, such as changing counsel and asserting ill health, to that end."

When we consider that both Alfred A. DuBan and his wife, Mamie, were clients of Alker and trusted him, and that she was 71 years of age when her husband died in 1938, and 86 years of age when she died in 1954, the entire course of Alker's dealings with her in her lifetime, and his desperate efforts to avoid responsibility for his obligations to her estate after her death must be characterized as nothing less than shocking.

His conduct in the DuBan case was clearly censurable, and, even if it stood alone, would necessitate his being disciplined by the courts.

The record also discloses that Harry J. Alker, Jr., respondent, has been disbarred from practice by the United States Treasury Department. This disbarment was affirmed by the United States District Court for the District of Columbia and by the Court of Appeals for the District, and a petition for a writ of certiorari was denied by the United States Supreme Court. Counsel for Alker attempts to minimize the effect of this disbarment, arguing that it should have no weight in our deliberations to determine whether Alker should be disciplined by us. We cannot agree with him. While disbarment by the Treasury Department would not automatically result in disbarment by the courts, we would certainly not concede that the standard of ethics controlling practice before a Federal administrative agency could be higher or more exacting than that prevailing in the courts of record of the Commonwealth of Pennsylvania. In our considered opinion, Alker's disbarment by the Treasury Department, alone casts a serious doubt upon his right to continue to practice in our courts. Considered in connection with his other involvements, it confirms our conclusion that his name had to be stricken from our rolls.