In Re: Stanley M. Greenberg, Judge, Court of Common Pleas of Philadelphia.

34

Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION BY MR. CHIEF JUSTICE JONES, April 4, 1974:

The present matter is before the Court pursuant to the petition of Stanley M. Greenberg to vacate order of suspension entered by this Court on March 24, 1971. The Opinion and Order of this Court upon petitioner's suspension are found at *In Re Stanley M. Greenberg, Judge, Court of Common Pleas of Philadelphia*, 442 Pa. 411, 280 A.2d 370 (1971). This Court's suspension order followed petitioner's conviction of one count of conspiracy in violation of 18 U.S.C. §371, on April 29, 1970, in the United States District Court for the Eastern District of Pennsylvania.

Petitioner has presented this Court with the strongest conceivable case for reinstatement of a judicial officer who has been suspended due to conviction of a crime. The strength of petitioner's case rests upon all of its facets: his exemplary reputation as a practicing lawyer and as a member of the judiciary; the unusual circumstances surrounding his trial and conviction; his outstanding service to the community, the legal profession and the courts even since his conviction

and suspension; the record compiled at a public hearing before a three-judge disciplinary court which decided not to impose disciplinary action upon petitioner as respects his position at the Bar; and, finally, the Presidential Pardon which petitioner obtained on December 5, 1973.

A review of all the circumstances briefly summarized above has convinced us that, if we are ever to permit a judge to resume his duties after a suspension due to conviction of a crime, the instant petition for reinstatement presents that situation.

Although it is, of course, not within our power to go behind the validity of petitioner's conviction collaterally, it is our duty to consider the totality of all the circumstances when determining questions pertaining to professional and judicial discipline.

Petitioner was convicted of one count of conspiracy in a federal mail fraud prosecution involving a check-writing scheme in which petitioner's then client was the principal. That conviction, however, was obtained after a complicated trial lasting eight weeks in which the jury had initially reported itself "hopelessly deadlocked" as to petitioner. Only after being sent back for further deliberation was the jury able to return a verdict slip on which petitioner had initially been found not guilty on all counts, and later found guilty as to Count I (the conspiracy count) and not guilty as to the remaining twenty counts which comprised the substantive charges. The mark which the jury had originally placed in the "not guilty" column for Count I was crossed out and placed in the "guilty" column.

Indeed, the trial court originally did not know what to make of the verdict slip. The trial court record reveals that the trial judge stated: "The Court: I might say for the record, the Court is very concerned with this verdict. I now show it to all counsel. I don't know what it means, very frankly, as to Count I."

The facts adduced at petitioner's trial establish that he signed none of the checks involved in the check-kite scheme; that he was neither an officer nor a director of the corporations when the checks in question were misused; that he received no money from the kite; and that no bank suffered any loss as a result of any act by petitioner. These facts, together with the testimony at petitioner's hearing before the Disciplinary Court of all the attorneys involved with the trial and subsequent appeals, convince us of the likelihood that petitioner was convicted solely due to his client's misdeeds.

Petitioner's client was tried together with him and petitioner was unable to divorce himself totally from the circumstances with which he found himself surrounded, especially in the atmosphere of a joint trial. Indeed, the only person capable of fully exonerating petitioner was his former client and co-defendant. But, on advice of counsel, petitioner's former client exercised his constitutional right to refuse to testify, and petitioner lost the only witness who could definitely establish his innocence.

Petitioner's co-defendant, his ex-client, Frank Alper, was represented by the Honorable G. Fred DiBona (now Judge of the Court of Common Pleas of Philadelphia County) and later by A. Charles Peruto. At the petitioner's disciplinary hearing both testified that Alper had always insisted upon petitioner's total innocence of the entire matter. John R. McConnell, an ex-chancellor of the Philadelphia Bar Association, who represented petitioner at his trial, testified: "Your Honors, on my oath as an attorney this man was no more guilty of the crime than my youngest daughter." Furthermore, Bernard G. Segal, past Chancellor of the Philadelphia Bar Association and past President of the American Bar Association, I. Raymond Kremer, and William T. Coleman, each of whom represented petition-

er in his appeals, indicated their firm belief in petitioner's innocence. Richard A. Sprague, First Assistant District Attorney for Philadelphia, also testified to his belief that petitioner was the victim of a "miscarriage of justice."

The Honorable Lawrence A. WHIPPLE, trial judge, who sentenced petitioner to a term of only six months' unsupervised probation, wrote a letter to President Nixon on April 25, 1972, in which, referring to petitioner's intention to seek a Presidential Pardon, he stated: ". . . I am thoroughly familiar with the factual background of this case and it is my judgment, considering the totality of the circumstances, that he is entitled to a pardon. . . ."

Due to petitioner's conviction, on April 7, 1972, the Committee of Censors of the Philadelphia Bar Association filed in the Court of Common Pleas of Philadelphia County a petition for a rule to show cause why petitioner should not be disciplined, by reason of his conviction, under Rule 200(d)(1) of that Court. On June 19, 1972, a three-judge disciplinary court, composed of the Honorable Herbert S. LEVIN, the Honorable Leo WEINROTT and the Honorable Edward J. BRADLEY, held an evidentiary hearing which was open to the public at petitioner's request.

The hearing produced an outpouring of support for petitioner. Every segment of the Bar was represented by those who spoke of petitioner's integrity and ability with the highest possible encomiums. Both of Philadelphia's past American Bar Association Presidents, Bernard G. Segal and David F. Maxwell, testified in petitioner's behalf. Bernard G. Segal testified that ". . . in my opinion, there is no Judge in the Courts of Philadelphia who is more highly regarded than Judge Greenberg and more justifiably so." Additionally, six former Chancellors of the Philadelphia Bar Association (Ber-

nard G. Segal, David Berger, Louis J. Goffman, Lewis
H. Van Dusen, Jr., John R. McConnell and Robert
Trescher)* similarly testified.

Nor was petitioner's support among the Bar limited
to its Associations' highest elected officers. Then District Attorney Arlen Specter and his First Assistant
Richard A. Sprague both affirmed petitioner's integrity
and abilities as both lawyer and judge. Vincent J. Ziccardi, the Chief Defender of Philadelphia, concurred in
their assessment. Representatives of both the plaintiffs'
and defendants' civil bar also concurred as did private
practitioners in the criminal bar. In addition to those
already mentioned, testimonial support came from Elwood S. Levy, Robert M. Sebastian, Austin Norris,
Bernard A. Smolens, Edward C. German, Donald J.
Goldberg and Richard G. Phillips. Professor I. Herman Stern of Temple University and Professor A. Leo
Levin of University of Pennsylvania also voiced their
strong support. Especially noteworthy was the testimony of Frank C. McGlinn, presently Executive Vice
President of the Fidelity Bank, which was named in the
indictment of petitioner as one of the banks allegedly
victimized by the check kite. Former Governor William
W. Scranton submitted a letter on petitioner's behalf
and also wrote to President Nixon in support of petitioner's application for a Presidential Pardon. Letters
in support of the pardon were also sent to the President
by the Honorable Herbert Fineman and the Honorable
Joshua Eilberg.

From the date of petitioner's suspension on March
24, 1971, to September 20, 1972, petitioner acted as *Supervisor of the Arbitration Program* in the Court of
Common Pleas of Philadelphia as well as performing

---

* Marvin Comisky, another past Chancellor of the Philadelphia
Bar Association and past President of the Pennsylvania Bar Association, represented petitioner before the disciplinary court and, of
course, did not testify as a witness.

other *administrative* non-judicial tasks assigned to him by the President Judge. During this period, petitioner received absolutely no compensation for his services. On September 20, 1972, President Judge JAMIESON appointed petitioner as Court Administrator for the Courts of Philadelphia County, a non-judicial office, and petitioner also served without pay in this position until July 2, 1973, at which time he commenced receiving remuneration for his services. Petitioner's exemplary conduct of these offices as well as his earlier handling of motion court and the civil calendar list were fully attested to by the Honorable Edward J. Blake, petitioner's predecessor as Court Administrator. It was under petitioner's guidance that the Philadelphia compulsory arbitration system was nurtured and made successful; the motion court system was revamped and revitalized, and an individual judge calendar for the civil side of the court was instituted and supervised. According to Judge Blake, petitioner held conferences and effected settlements in at least 1,000 cases between the date of his suspension (March 24, 1971) and the date of the disciplinary hearing (June 19, 1972). Because of his suspension as a judge, these settlements could only be effectuated where counsel for all parties requested petitioner's assistance. This alone speaks most eloquently of the respect that the Bar had for petitioner's integrity and fairness.

President Judge D. Donald JAMIESON has also written of the outstanding services which petitioner has rendered to the Philadelphia courts:

"[Petitioner] has been of invaluable assistance to me since my appointment as President Judge. He has no peer in our judiciary in the area of civil cases. He has the respect and confidence of his fellow judges as well as all segments of the bar. He is an indefatigable worker whose average working day begins at 7:45 a.m.

and ends on most days after 6:00 p.m. As a result I can and do call upon him to expedite matters and to perform administrative functions with full confidence that they will be carried out expeditiously and efficiently. . . . The citizens of Philadelphia will be the eventual beneficiaries of the work he is doing. Litigants will be afforded their day in court much more expeditiously as a result of the projects he has innovated and on which he is now working. . . .

"All of us who know him believe without question in his innocence. He bears an excellent reputation in the community even today and until such time as he is able to return to his full judicial duties I would strongly recommend that nothing be done which would prevent our utilizing his services. . . ."

At the conclusion of the testimony, the disciplinary court asked James D. Crawford, counsel for the Committee of Censors, for the Committee's recommendation. Although the Committee was bound to file the petition, Mr. Crawford stated: "I have no question on this case . . . it has been discussed at not one but two meetings of the committee . . . and I have discussed it personally with every member of the committee. I have no question that the committee . . . is of the opinion that as of this time and this time forward Judge Greenberg is fit to be a member of the Bar in good standing as any man at the Bar. . . ."

After consideration of the evidence produced, which has been summarized herein, the three-judge disciplinary court unanimously found petitioner's "integrity, reputation and character has been and is excellent and beyond reproach." It dismissed the petition of the Committee of Censors with prejudice and ordered that the conduct of the respondent (petitioner herein), in the light of all the circumstances, required that no disciplinary action be imposed, and the court therefore imposed none.

On July 26, 1973, he was awarded a citation by the Pennsylvania House of Representatives. That body "commends Judge Greenberg for his dedication to the highest principles of the Bench and the Bar. His judicial wisdom and outstanding leadership activities reflect great credit upon himself and the Commonwealth of Pennsylvania."

Finally, on December 5, 1973, the President of the United States, pursuant to the prerogative vested in him by the Constitution of the United States, Article II, Section 2, Clause 1, granted to petitioner a full and unconditional pardon.

The United States Supreme Court has held that a Presidential Pardon "reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. . . . [I]f granted after conviction, it removes the penalties and disabilities and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity." *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 380-381 (1867).

Although a pardon has been held not to be a complete defense to an attorney's disciplinary action, *Wolfe's Disbarment,* 288 Pa. 331, 135 A. 732 (1927), it certainly must be an important consideration for our determination of whether to continue an existing suspension. We cannot totally ignore the fact that petitioner was a state judge, that he was convicted in a *federal* trial, and that he was pardoned by the highest federal executive official—on the recommendation of, among others, the federal trial judge. We cannot totally ignore the policy set by the highest court of this country that a Presidential Pardon is designed to remove all penalties and disabilities and restore all civil rights.

Ultimately, of course, we must decide what is in the best interest of the public and the courts. *In re Alker*, 16 Pa. D. & C. 2d 653, 661 (Phila. O. C. 1959), *aff'd*, 398 Pa. 188, 157 A.2d 749 (1960). Upon review of the entire matter, we can only conclude that the public and the courts of this Commonwealth have a great deal to gain from a continuation of the service of this judge.

Accordingly, the Order of this Court of March 24, 1971, suspending The Honorable Stanley M. Greenberg from his office and prohibiting the exercise and performance of his judicial functions, acts and duties is hereby vacated.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

Chief Justice BELL, Justice BARBIERI, and this writer dissented from the Court's suspension order of March 21, 1971, which, in the words of that majority, "was entered with reluctance." 442 Pa. at 413, 280 A.2d at 370. Today I am pleased to join in vacating that order.

In 1971 I was "fully persuaded that justice and wisdom indicate that we rely on these highly competent and totally responsible recommendations" of leaders of the community and bar. 442 Pa. at 421, 280 A.2d at 374. Today the consensus remains, and indeed more expressions of confidence have been added to the general accord. My dissent from the 1971 suspension order was also based on the fact that "the conduct complained of involved no judicial misconduct and is alleged to have occurred more than seven years ago, prior to [petioner's] ascending the bench." Id. These considerations are more compelling today.

The only argument offered for continuing the suspension order is that public confidence requires it. That notion is contrary to the views expressed by representative and responsible community leaders, professionally concerned with the administration of justice in Phila-

delphia. These leaders positively attested to the exemplary quality of petitioner's judicial service. In view of this strong unanimous community support for petitioner, vacating the order is in the public interest.

The traditional function of courts is to administer justice by the sound exercise of discretion under law. Justice is furthered not by unvarying imposition of maximum penalties, but by fixing of sanctions fitted to the particular circumstances of an individual's case.

This Court's order ending the three-year suspension of petitioner recognizes the fundamental principle of our jurisprudence that an individual's case be considered on the merits.

---

CONCURRING OPINION BY MR. JUSTICE NIX:

I concur in the result reached by the majority because I believe that it is both morally and legally compelled. Aristotle once observed: "Courage is a mean with respect to things that inspire confidence or fear, in the circumstances that have been stated; and it chooses or endures things because it is noble to do so, or because it is base not to do so. But to die to escape from poverty or love or anything painful is not the mark of a brave man, but rather of a coward; for it is softness to fly from what is troublesome, and such a man endures death not because it is noble but to fly from evil."[1] I emphatically reject the suggestion that we ignore justice in this or any other cause in an effort to insulate the bench from criticism. Lasting faith and respect for a system will never be achieved by assuming the posture of a reed bending in the wind of public opinion. We are charged to dispense justice in each and every matter that comes to us for judgment, this commitment may never be deterred by a fear of an unpopular response to a decision.

---

[1] Nicomachean Ethics, Book III, Chap. 7.

As a result of conduct attributed to petitioner prior to his appointment to the bench he was subsequently convicted of one count of conspiracy in violation of 18 U.S.C. Sec. 371 in the United States District Court for the Eastern District of Pennsylvania. That conviction was appealed to the Circuit Court of Appeals and affirmed. *United States v. Alper et al.*, 449 F.2d 1223 (3d Cir. 1971). A writ of certiorari was denied by the Supreme Court on March 20, 1972. After denial of the post-trial motions by the District Court[2] and before the decision of the Court of Appeals this Court entered an order suspending petitioner from continuing to serve as a Judge of the Court of Common Pleas of the First Judicial District until the issue of his criminal conviction became final. *In re Greenberg*, 442 Pa. 411, 280 A.2d 370 (1971). The proceedings in the Federal System having been concluded the matter is again before this Court for a final determination pursuant to Art. 5, Sec. 18 of the Pennsylvania Constitution.

At the outset we must determine what interest or interests are sought to be protected by sections 17 and 18 of Art. 5. In an opinion in support of the order representing the views of four members of the Court it was suggested: "What we seek to do is to maintain the integrity of the office of judge to the end that that office, and through it the administration of justice, will deserve and receive the support not only of litigants and lawyers but of the public as well." *In re Greenberg, supra* at 418, 280 A.2d at 373. While I unhesitatingly accept the above statement as an expression of a part of that which we seek to achieve, equally as important is that it must be remembered that we are also considering the sanction to be imposed upon petitioner for errant behavior. To argue that "we do not sit in judgment of

---

[2] Imposition of sentence was suspended and petitioner was placed on probation for a period of six months without supervision.

Judge Greenberg nor mete out punishment to him"[3] is to ignore reality and embrace a distinction without meaning. To deprive a man of an office of high esteem which has been obtained after years of preparation, effort and sacrifice because of conduct on his part deemed incompatible with the position held is in fact the imposition of a sanction for that conduct. As in all other instances in our law where the issue is a sanction to be imposed we must also consider the basic and fundamental fairness of the judgment to the one subject to the sanction. It is for this reason that I cannot accept the view that our only consideration in this inquiry is public opinion. Justice must be given to this petitioner and the respect for the integrity of our courts must flow from a recognition of the fairness of our judgment.

Further, it should be emphasized that the Constitution vests ultimately in this Court the responsibility of election from several options the appropriate remedy to be employed to rectify a breach of Art. V, Section 17.[4] Art. V, Section 18 grants this Court the power, except in two instances not here applicable[5] to: "(h) . . . review the record of the board's proceedings on the law and facts and may permit the introduction of additional evidence. It shall order suspension, removal, discipline or compulsory retirement, or wholly reject the recommendation, as it finds just and proper."

The board recommended that in the event the conviction was upheld the petitioner should be removed from office. The board's deliberations understandably did not anticipate a presidential pardon that was award-

---

[3] *In re Greenberg, supra* at 418, 280 A.2d at 373.

[4] The pertinent sub-paragraph of this section provides: "(b) Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court."

[5] See Art. V, Section 18(1) and (m).

ed to petitioner on December 5, 1973. See *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L. Ed 366 (1867). Furthermore, the board was without the benefit of the unprecedented number of endorsements as to the high esteem petitioner enjoys from leaders of the bench, bar and community even after the fact of his conviction became public knowledge.

These factors coupled with his unquestioned ability as a judicial officer argue strongly against the imposition of the most severe sanction available, i.e., removal. Members of the minority who urge removal attempt to justify their position by asserting that his conviction casts a cloud upon petitioner's integrity and that his retention would in turn infect the entire system. This argument is without support on this record. The evidence is overwhelming that petitioner's integrity is respected in all segments of our community. The chimerical fear that the conviction would cause all future judgments of petitioner to be suspect is not supported by a scintilla of evidence.

Equally as significant is that the people of this Commonwealth rejected the institution of an appointive selection of judges and required that judges stand for popular election. Art. V, Section 13. Thus, the Constitution of this Commonwealth has vested within the people of this state the final judgment as to whom should be permitted to serve as their judges. Petitioner, having been elected by the people of the City of Philadelphia in the municipal election of 1965 to commence a ten-year term of office beginning January, 1966, must if he wishes to continue to serve in that capacity stand for retention election in the municipal elections of 1975. See Art. V, Section 15. If, as contended by the dissent, petitioner's actions have occasioned a loss of confidence in his ability to discharge his judicial duties it will best be demonstrated at that time. In any event there is absolutely no justification to assume

such to be the case on a record where the only evidence strongly indicates the contrary.[6]

I believe that a consideration of all of the factors presented justifies a rejection of the imposition of an order of removal. For the reasons set forth above the three-year suspension from office that petitioner has undergone fully serves as an adequate and fair punishment for his violation of Art. V, Section 17(b).

[6] There is nothing within the provisions of Art. V, Section 18 that would indicate that even removal from office would act as a permanent bar to prevent a judge so removed from seeking re-election under Section 13.

CONCURRING OPINION BY MR. JUSTICE MANDERINO:

I concur for the reason that the petitioner has received an unconditional Presidential pardon. A Presidential pardon is the exercise of a constitutional authority delegated to the President who is, in effect, the court of last resort in the federal system superseding, except in cases of impeachment, even the decisions of the United States Supreme Court. The effect of the unconditional pardon is the nullification of the petitioner's conviction in the same manner and with the same effect as though the petitioner's conviction had been reversed by the Supreme Court of the United States. The Presidential pardon is binding upon this Court just as decisions of the United States Supreme Court are binding upon us. Because of the Presidential pardon, which reverses petitioner's conviction, this Court may not arbitrarily remove the petitioner from an office to which he has been elected. An unconditional Presidential pardon "blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence." *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L. Ed. 366 (1867). The petitioner's status as a judge is irrelevant

to the legal and constitutional question before us. The result is mandated in all such cases. The petitioner is entitled to the equal protection of the law.

―――――

DISSENTING OPINION BY MR. JUSTICE EAGEN:

The opinion of the Court in this case could not be more excusatory of Judge Greenberg's past conduct if the Judge had written it himself. But, no amount of verbosity can explain away the fact Judge Greenberg was convicted by a jury in a Federal District Court of participating in a criminal conspiracy to defraud certain banks of thousands of dollars, and, despite appeals to the Circuit Court of Appeals and the Supreme Court of the United States, his conviction stood firm.[1]

Hence, the sole issue now in controversy is whether one who has been convicted of such a crime should be permitted, with this Court's approval, to continue to serve as a judge in this Commonwealth. While I sympathize with Judge Greenberg's plight, public confidence and respect in and for the courts must be given top priority. Reinstatement of Judge Greenberg will not enhance that confidence and respect, rather will it serve to increase the cynicism about the courts and the law now all too prevalent in this nation.

Finally, another facet of this case should not go unnoticed. On March 24, 1971, this Court, after many months of inaction and "looking the other way" in the case, entered an order suspending Judge Greenberg from his judicial office and "prohibiting [him] from the exercise of any and all judicial functions." Despite this interdiction, and despite the subsequent re-

―――――

[1] Although this Court makes a valiant effort to belittle Judge Greenberg's involvement in the criminal conspiracy, anyone interested in the facts and what the trial evidence disclosed may refer to the unanimous opinion filed by the Circuit Court of Appeals in affirming Judge Greenberg's conviction. See 449 F.2d 1223 (3d Cir. 1971).

jection by this Court of a petition submitted by the President Judge of the Court of Common Pleas of Philadelphia seeking our approval of, and, participation in, an order appointing Judge Greenberg court administrator of the courts of Philadelphia, the President Judge of the courts of Philadelphia executed such an order on his own. While this Court may now characterize the functions performed by Judge Greenberg as "non judicial", every knowledgeable person knows otherwise. To me, it is clear that Judge Greenberg has flouted our order of March 24, 1971, and this conduct instead of being cited as cause for his reinstatement should be condemned in the most emphatic terms.

In my view, this Court's action is a serious mistake. Mr. Justice POMEROY joins in this dissenting opinion.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

When, on March 21, 1971, the Court entered its order that petitioner be suspended from the exercise of his judicial duties, it was done "with reluctance". *In Re Stanley M. Greenberg, Judge, Court of Common Pleas of Philadelphia*, 442 Pa. 411, 413, 280 A.2d 370 (1971) [hereinafter "In re Greenberg"]. It is with reluctance that I now feel obliged to dissent from the order which the Court today enters, vacating that of three years ago. I do so out of no desire to perpetuate or accentuate the problems or difficulties of the petitioner. In the penultimate paragraph of the opinion announcing today's decision of the Court, the real issue before us is finally mentioned, viz., "what is in the best interest of the public and the courts?" It was exactly this issue with which we were faced in March of 1971. We then answered that the suspension order was "necessary in order to uphold respect for the rule of law and the administration of the judicial process in the courts of this Commonwealth". Today, the Court, in its de-

sire to be scrupulously fair to a person of whose many excellent attributes there can be no doubt, veers 180 degrees to the opposite result. In doing so, I fear it overlooks where the interest of the public and of our judicial system truly lies. That interest lies in public confidence and trust in our courts and the judicial system of our Commonwealth.[1] That interest can be served only by having judges on the bench whose honesty and integrity are beyond question. That interest, which must be paramount to any personal considerations, cannot be served by continuing in judicial office a person who had been convicted of a felony, the core of which is dishonest and fraudulent conduct.[2]

---

[1] As we put it in 1971, "What we seek to do is to maintain the integrity of the office of judge to the end that that office, and through it the administration of justice, will deserve and receive the support not only of litigants and lawyers but of the public as well." 442 Pa. at 418.

Chief Justice Jones touched on this theme in his annual State of the Judiciary Address delivered in January, 1974 to the Pennsylvania Bar Association. He noted that it is "more imperative than ever that we double our efforts to restore public confidence in the integrity of the law, in our profession and in the administration of justice . . . . We *must* create a better understanding in the public mind that lawyers and judges are ethical and are seriously concerned with achieving real justice through law." Vol XLV Pa. Bar Quarterly 152 (March, 1974).

As Dean Hyde has said, "Our democracy cannot survive unless the people believe that the courts will do justice. We claim we have a monopoly on justice, but we don't. People can and will take their business elsewhere if they lose trust in the courts. 'Elsewhere' means the streets." L. M. Hyde, Jr., *"Good Judges are Made * * *"*, an address to the National Conference on the Judiciary, as printed in Law Enforcement Assistance Administration, Justice in the States 172, 173 (1971). *See generally* A. Miller, Public Confidence in the Judiciary, Some Notes and Reflections, 35 Law and Contemporary Problems 69 (1970).

[2] Article V, §18(d) of the Pennsylvania Constitution, under which the Court took its 1971 action in suspending Judge Greenberg, provides in relevant part: "[A]ny justice or judge may be sus-

The majority opinions seek to justify the vacating of our former order by developments which have occurred since it was entered. In my view, those developments should properly have resulted in an order as of course removing petitioner from office. Clearly, some history not related in the opinions of the majority is necessary for an understanding of this divergence of views.

Our order of March 24, 1971 was entered after denial of post-trial motions in the federal district court, but while an appeal from petitioner's conviction was

---

pended removed from office or otherwise disciplined for violation of section seventeen of this article [*i.e.*, engaging in any activity prohibited by law or violation of any canon of legal or judicial ethics prescribed by this Court], misconduct in office, neglect of duty, failure to perform his duties, or *conduct which prejudices the proper administration of justice or brings the judicial office into disrepute . . . .*" (Emphasis supplied.)

The fact that petitioner is a trial judge makes the problem of public confidence especially serious. In his article, *The Trial Judge—Role Analysis and Profile*, Professor Harry W. Jones has observed: "Aristotle was surely right when he said that members of the public look upon the judge as 'living justice', that is, the personification of the legal order. For better or worse, it is the trial judge upon whom this representative responsibility falls in our society. He *is* the law for most people and most legal purposes. Whenever a trial judge fails in probity, energy, objectivity or patience, his failure is observable and cannot but impair public fidelity to law." The Courts, the Public and the Law Explosion 124, 125, 126 (H. Jones, ed., 1965).

As another distinguished observer has noted, ". . . it is fair to say that the man on the street harbors a particularly low opinion of judges and lawyers, of courts and their decisions. One senses a general feeling that our courts, and more recently our trial courts in particular, lack credibility, that somehow our judicial system has failed society, that our judges are cavalier and callous, inconsistent in discharging their responsibilities." *The Functioning of the Trial Judge*, address by Bernard G. Segal, Esquire, to the Pennsylvania Conference of State Trial Judges and the Judges of the United States District Courts in Pennsylvania, April 12, 1973.

pending in the United States Court of Appeals for the Third Circuit. The order was to be in effect "until the issue of his conviction . . . shall become final". While our order did not spell out what then would happen, the recommendation of the Judicial Inquiry and Review Board,[3] upon which we were acting, pointed to the obvious alternatives. "In the event said conviction is upheld," recommended the Board, "the said Stanley M. Greenberg shall be removed from his judicial office; and in the event that the said Greenberg's conviction is reversed and a judgment of acquittal or dismissal entered in the case, the suspension shall be removed and the said Stanley M. Greenberg shall be reinstated and restored to the office of judge of the Court of Common Pleas with such compensation as he would be entitled to by law." As we said in our earlier opinion, ". . . the action here taken, *because of the pendency of appeal, is not removal* but the lesser penalty of suspension". (Emphasis supplied.) 442 Pa. at 417.[4]

---

[3] For the origin, composition and cognizance of the Judicial Inquiry and Review Board, *see* note 1 to our earlier opinion. *In Re Greenberg*, 442 Pa. 411, 413.

[4] When the case was first before our Court in 1971, Judge Greenberg did not challenge this portion of the Board's recommendations. He filed with this Court a "Petition for Modification of the Recommendation of the Judicial Inquiry and Review Board", whereby the suspension would not be "from his office" but only from the exercise of judicial functions [to permit him to continue to perform administrative services as a judge], and whereby a grant of a new trial as well as a judgment of acquittal after reversal would result in a lifting of the suspension.

In the same petition, Judge Greenberg challenged the Board's finding that his conviction had prejudiced the proper administration of justice and brought the judicial office into disrepute, "inasmuch as such conviction *does not yet constitute a final determination* regarding his guilt or innocence since *there has as yet been no decision by appropriate appellate authority as to the correctness and legality of such conviction*". (Emphasis supplied.)

The criminal case (United States of America v. Frank Alper, Stanley M. Greenberg, and Morton Feiner, No. 71-1318) was argued in the Court of Appeals for the Third Circuit on June 21, 1971, and on September 14, 1971, that court affirmed the judgment below.[5] *United States v. Alper et al.,* 449 F.2d 1223 (3d Cir. 1971). Thereafter, a petition for a writ of certiorari was filed with the Supreme Court of the United States, and on March 20, 1972, that petition was denied without dissent. 405 U.S. 988, *rehearing denied,* 406 U.S. 911 (1972).[6]

The opinion of the court of appeals is instructive. Its summary of the charges against petitioner and his co-defendants is reproduced in the margin.[7] With re-

Three justices of our Court dissented from the blanket order of suspension and would instead have limited and restricted petitioner's services "exclusively to administrative functions and voluntary settlement conferences". One of their stated reasons was because ". . . the charges have not yet been finally adjudicated". Opinion in Opposition to Order, filed by Mr. Justice ROBERTS and joined by Mr. Chief Justice BELL and Mr. Justice BARBIERI. 442 Pa. at 420, 421.

[5] The hearing panel consisted of Chief Judge SEITZ, and Judges GIBBONS and ROSENN. The opinion of the court was by Judge GIBBONS.

[6] It was at this point that our Court should, in my opinion, have changed its suspension order to one of removal, in accordance with the Board's recommendation.

[7] "The conspiracy count and the mail fraud counts all relate to a complicated check kiting scheme involving checking accounts of Alper, Greenberg, Magnum Chemical Corporation, Life Aid Corporation, Trans-Ignition Systems, Inc., Portable Oxygen Corporation and Stellar National Products, Inc. The kite allegedly was run for the purpose of obtaining money from Central Penn National Bank, Industrial Valley Bank, Philadelphia National Bank and Fidelity Philadelphia Trust Company, all of Philadelphia, and Peoples National Bank of Westmont, New Jersey, First National Bank of Stone Harbor, New Jersey, Cherry Hill National Bank, Cherry Hill, New Jersey, Delaware Valley Bank and Trust Company, Cherry Hill, New Jersey and First National City Bank of New York. Checking

spect to the denial by the district court of Judge Greenberg's motions for a judgment of acquittal both at the end of the government's case and at the end of the entire case, the opinion states as follows: "Greenberg contends that he was related to Alper and the corporations only as an attorney and that the evidence relied upon by the government is as consistent with his lack of knowledge about and participation in the conspiracy as with guilt. We cannot agree. As with Alper a detailed recital of the evidence would serve no useful purpose. But it could hardly have been proper to grant Greenberg's motion for a judgment of acquittal when the evidence showed that at times when Greenberg, a former director[1a] of several of Alper's corporations, was still on their payroll he drew nine checks on his personal checking account with the Central Penn National Bank in amounts which he then knew were in excess of the account balances payable to Life Aid Corporation, and covered these checks with checks which he then

transactions alleged to have been made in furtherance of the conspiracy began in September of 1963 and continued until June of 1965, when the kite was discovered by some of the banks.

"The corporations against whose accounts checks were drawn were all formed at the behest of Alper to carry on a sales business. Greenberg, an attorney, formed each corporation. He became a director of Magnum and of Life Aid. Several of the corporations paid Greenberg $100 per week, from which federal income taxes and Social Security taxes were withheld. These payments continued until late February 1965. One of Alper's corporations furnished Greenberg with an automobile. Feiner was an accountant hired for the corporations by Alper in March of 1965. The co-conspirator, Hartsock, was an officer of Peoples National Bank, and was charged by the government as being instrumental in concealing the existence of the kite from his own and other banks. Hartsock died before the indictments were returned." 449 F.2d at 1225, 1226.

"[1a] Greenberg resigned from his director's post on June 15, 1963, following his appointment as general counsel for the Pennsylvania Securities Commission and in anticipation of his appointment as a Judge of the Common Pleas in Philadelphia." 449 F.2d at 1227.

knew were drawn by Alper on a corporate account against uncollected funds. The drawing of three of these checks is alleged as an overt act in the conspiracy count. After Greenberg resigned as a director of the Life-Aid and Magnum corporations, he continued his close business relationship with Alper. He continued to receive and accept weekly payments from Alper's corporations and attempted to help Alper obtain investors and financing. Furthermore, during the time that Alper's corporations were experiencing difficulties with various banks because of overdrafts, Greenberg contacted officials of these banks and interceded on Alper's behalf. From Greenberg's continued close association with Alper, his direct participation in a check kite in the early stages of Alper's manipulations, and his efforts in the later stages to reassure several bankers worried about overdrafts, the jury could reasonably conclude that he was and continued to be a conspirator with Alper in a scheme to defraud. The evidence against him, though not as overwhelming as that against Alper, who played the leading role in this drama of high finance, was clearly sufficient to withstand a motion for a judgment of acquittal and to sustain the jury's verdict against Greenberg."

That part of the circuit court's opinion dealing with the denial of motions for a new trial is also illuminating. Thus, with reference to alleged error in admission of testimony concerning telephone conversations, the court of appeals said, *inter alia*: "Greenberg in his testimony denied the Brammer telephone conversation. The calls to Kaelin and Egner, however, are not disputed. Thus at most the Brammer call is cumulative of other evidence that at a critical period during which the house of cards, or rather of checks, was collapsing Greenberg was reassuring certain worried bankers. We cannot overlook the fact that we are dealing with brief and cumulative testimony in a trial of nine weeks duration

presenting voluminous documentary and testimonial evidence. Even if the Brammer testimony should, therefore, have been stricken (or more likely additional evidence of circumstantial corroboration required) the error, if any, produced no substantial prejudice and must be disregarded. Rule 52(b), Fed. R. Crim. P." 449 F.2d at 1229.

Today's opinion by the Chief Justice points out that Judge Greenberg was tried with his client and so "was unable to divorce himself totally from the circumstances with which he found himself surrounded, especially in the atmosphere of a joint trial". The opinion further observes that when the client refused on constitutional grounds to testify, "petitioner lost the only witness who could definitely establish his innocence". This argument was also made in the court of appeals; petitioner there asserted that, in a new trial, the client, Alper, and co-defendant Feiner (the first having been convicted on all counts and the other acquitted) would be available to testify favorably to Greenberg, and that a new trial should be had for this reason. The Court of Appeals, in denying this relief, said, in part, as follows: "Assuming, however, that the limited and cumulative testimony which Alper would give would likely be helpful, Greenberg's difficulty is that in the district court he made a tactical decision not to pursue the steps which might have made Alper's testimony available. He made, but later abandoned, a motion for a severance. Had that motion been pursued Alper could have been tried first, and thus have been available to testify. There is no question that the choice to abandon the severance motion was a reasoned tactical decision. Where it is clear that the defendant knew of the existence of evidence and willfully failed to take steps to secure its availability he cannot urge that evidence as a ground for a new trial [citations omitted]." 449 F.2d at 1234.

It is difficult for me to understand how this Court can now, in effect, disregard this decision and opinion of the Court of Appeals, and conclude that "the likelihood [is] that petitioner was convicted solely due to his client's misdeeds". (Opinion of the Chief Justice, page 36, *supra.*) This comes perilously close to impugning the fairness of petitioner's trial and the competence of the appellate review afforded in the federal courts, and to my mind, is as improper as it is unwarranted.

The opinions of the Court, while ignoring the appellate history of the petitioner's conviction, give detailed attention to two post-litigation developments which, as I view the issue before us, are quite irrelevant. The first was the decision of the Court of Common Pleas of Philadelphia not to impose discipline on Greenberg *as a lawyer.*[8] While it is possible for a particular act or course of conduct to result in the same decision (i.e., disciplinary action or exoneration) whether a person is a lawyer or a judge, this is not necessarily so. A judge can and should be held to a higher standard than a lawyer. Thus, the Supreme Court of California has recently removed a judge from office, but directed, at the same time, that he be permitted to practice law in the State of California. *Geiler v. Commission on Judicial Qualifications,* 515 P.2d 1, 110 Cal. Rptr. 201 (1973).[9]

---

[8] Although this Court had adopted, before the hearings in this matter, new Rules of Disciplinary Enforcement, they did not become effective until September 1, 1972 (later extended to November 1, 1972), and the procedure followed was, therefore, proper as far as a lawyer was concerned. The petitioner, however, was not then entitled to practice law, as his 1971 Petition for Modification concedes. It is arguable that the sole authority to impose discipline upon petitioner as long as he retained judicial office lay in this Court upon the recommendation of The Judicial Inquiry and Review Board. *See* Constitution of Pennsylvania, art. V, §18.

[9] The California Supreme Court explained its decision: "As indicated above, before the advent of the Commission on Judicial Qualifications the bar of this state was held to a higher standard

The parade of distinguished character witnesses for petitioner at his hearing was, indeed, impressive. With all respect, however, these persons do not constitute the larger public or the litigants whose confidence in our courts and in the probity of our judges is of paramount importance, nor can their testimonials with respect to fitness to practice law be substituted for the judgment of this Court as to fitness to be a judge.[10]

The other development since our order of 1971 which the majority stress is the receipt of a presidential pardon in December, 1973.[11] The instant petition to va-

---

of conduct than the bench. This anomaly has since been rectified and the reverse is now true. We recognize that petitioner's removal from office is required more by the high standards of judicial office than by his personal failings. Much evidence was adduced before the Commission of petitioner's diligence in the work of the law, and his unjudicial conduct cannot be said to amount to moral turpitude, dishonesty or corruption. (Cf. Bus. & Prof. Code, §6106.) We therefore further order that despite his removal from judicial office Leland W. Geiler shall if otherwise qualified be permitted to practice law in the State of California. (See Cal. Const., art. VI, §18, subd. (d).)" 110 Cal. Rptr. at 212, 515 P.2d at 12.

[10] In addition to the laudatory testimony at the disciplinary hearing in the court of common pleas, the majority opinion refers to a letter from the Hon. D. Donald JAMIESON, President Judge of the Court of Common Pleas of Philadelphia, which speaks in complimentary terms of Judge Greenberg, particularly with regard to his performance of administrative functions, expresses belief in his innocence, and makes the recommendation that "nothing be done which would prevent our utilizing his services [in an administrative capacity in the civil side of the court]". This letter, and several similar letters from members of the bar, were before us and were fully considered prior to our order of March, 1971. 442 Pa. at 419, 420. Similarly, the circumstance that the federal jury initially reported difficulty in reaching a verdict as to petitioner was before us in 1971.

[11] The warrant formally signifying that President Nixon had granted a pardon was received by petitioner in early January, 1974. The letter of transmittal to Judge Greenberg by Hon. Robert H. Bork, Acting Attorney General, states that "The President recog-

cate the order of suspension was filed immediately thereafter.

The opinion announcing today's decision cites our opinion in *Wolfe's Disbarment*, 288 Pa. 331, 135 A. 732 (1927), as holding that a pardon is not "a complete defense to an attorney's disciplinary action". This is an understatement. The Court there quoted with approval the "generally accepted rule" as stated in Corpus Juris: " 'In a proceeding to disbar an attorney on the ground that he has been convicted of a crime, the fact that he may have been restored to his rights of citizenship by pardon, by serving out his term of imprisonment, or by the payment of a fine is not, in most jurisdictions, a defense to proceedings for disbarment': 6 C. J. 587; 2 R. C. L. 1102; Annotated Cases, 1917A, note 1226." 288 Pa. at 336. The general rule has not changed in the intervening years. "By the great weight of authority, a pardon as to the conviction of a crime for which an attorney has been disbarred neither nullifies the disbarment nor compels the court to nullify it." 70 A.L.R. 2d 268, 331 (1960). Thus, the Supreme Court of Ohio has held, in permanently disbarring a lawyer from the practice of law, that "a pardon will not and cannot rectify the acts which the respondent has committed or the course of conduct in which he has engaged". *Cincinnati Bar Association v. Shott*, 10 Ohio St. 2d 117, 226 N.E. 2d 724, 733 (1967). In *State ex rel. Attorney General v. Irby*, 190 Ark. 786, 81 S.W. 2d 419 (1935), a county and probate judge was removed from his office because of conviction of embezzlement of United States monies at an earlier time when he was a

---

nizes that by observance of high moral standards you are worthy of the forgiveness which the pardon symbolizes". [Letter from Marvin Comisky, Esquire, to the Chief Justice of Pennsylvania dated January 8, 1973 [sic], and filed, with its enclosures, in the office of the prothonotary of this Court.]

postmaster. The defendant had received a pardon from President Hoover. Said the Supreme Court of Arkansas: "We think it self-evident that the issuance and acceptance of a pardon within its self irrevocably acknowledges a conviction of the crime pardoned and has the effect only of restoring civil rights as distinguished from political privileges." 190 Ark. at 797, 81 S.W. 2d at 424. A pardon, by its very nature, is an act of grace, of forgiveness, by the sovereign who has imposed punishment. *Commonwealth v. Cannon*, 386 Pa. 62, 66, 67, 123 A.2d 675 (1956). Our order of suspension was not an act of punishment; that role belonged solely in the federal court. *In Re Greenberg*, 442 Pa. at 418. As this Court acknowledged in *Alker Disbarment Case*, 398 Pa. 188, 157 A.2d 749 (1960), in affirming a disbarment order on the careful opinion of President Judge KLEIN of the Orphans' Court of Philadelphia County, not only has conviction of a crime been uniformly regarded as cause for disbarment in Pennsylvania, but "it is well settled in this State that even acquittal of the crime charged does not preclude disbarment action when deemed appropriate". 16 D. & C. 2d 653 at 662 (1959). A pardon can be entitled to no greater weight than an acquittal.

In adopting in 1973, with minor modifications, the new Code of Judicial Conduct proposed by the American Bar Association, *see* 455 Pa. xxix, to replace the Canons of Judicial Ethics, the Court took a large step forward in its efforts to achieve and maintain the highest standards of judicial conduct. By its action today, well meant as it is, the Court, in my view, takes a step which I can only characterize as retrogressive. Hence, this dissent.

Mr. Justice EAGEN joins in this dissenting opinion.