KAUTZ, Justice,
dissenting, in which, DAVIS, Justice, joins.
[¶77] I must respectfully, but vigorously, dissent.
[¶78] This case is of the utmost importance to the State of Wyoming. It is a case confronting new and challenging issues, where the parts of the legal landscape recently changed dramatically and rapidly.[16] Contrary to the position asserted by the majority opinion, this case is about religious beliefs and same sex marriage. The issues considered here determine whether there is a religious test for who may serve as a judge in Wyoming. They consider whether a judge may be *754 precluded from one of the functions of office not for her actions, but for her statements about her religious views. The issues determine whether there is room in Wyoming for judges with various religious beliefs. The issues here decide whether Wyoming’s constitutional provisions about freedom of religion and equality of every person can coexist. And, this case determines whether there are job requirements on judges beyond what the legislature has specified.
Judge Neely’s Background
[¶79] The majority opinion summarizes facts from the record. However, in addition to the facts presented by the majority, some additional facts are important to this decision.
[¶80] Prior to this case, Judge Neely has never been accused of prejudice or bias, and has never had a complaint brought against her either before the Commission or the Pinedale town council. Judge Neely has an outstanding record and reputation, being recognized for her fairness and willingness to serve the public. The current Mayor of Pine-dale, Bob Jones, who has known Judge Neely for over ten years, states that “she has a sterling reputation in the community as a person of unswerving character and as an honest, careful, and fair judge.” After observing her on the bench, Mayor Jones said he “cannot imagine a situation in which she would treat unfairly anyone who appears before her.” Former mayor, Miriam Carlson, who also appointed Judge Neely and observed her both while mayor and later while serving on the town council, states “based on my experience watching her operate as a municipal judge, she has always been fair and impartial. In fact, I don’t think you could find a fairer person to be a judge.”
[¶81] Pinedale town attorney, Ralph E. Wood, has observed Judge Neely during his entire tenure as town attorney—seventeen years. Based on his experience he describes Judge Neely as “a dedicated public servant and an unselfish and generous member of the community more generally.” He unequivocally states that “in my experience, every party who appears before Ruth gets a fair shake, and she has never exhibited even the slightest hint of bias, prejudice or partiality toward anyone.” Under oath, Mr. Wood states “based on my experience, Ruth’s religious belief regarding marriage and her inability to officiate at same-sex wedding ceremonies does not, and will not, affect in any way her impartiality as a judge.”
[¶82] Judge Neely serves on the steering committee of the Sublette County Treatment Court. The coordinator of that agency, Kathryn Anderson, has known Judge Neely since 2006. Ms. Anderson is married to her same sex partner, Ms. Stevens. She is fully aware of Judge Neely’s views on same sex marriage, yet describes Judge Neely as a “conscientious, fair, and impartial person.” Ms. Anderson states, “I have no doubt that she will continue to treat all individuals respectfully and fairly inside and outside her courtroom, regardless of their sexual orientation. Accordingly, I believe it would be obscene and offensive to discipline Judge Neely for her statement ... about her religious beliefs regarding marriage.”
What Judge Neely Said and Did
[¶83] On December 5, 2014, Ned Donovan, a reporter from the Pinedale Roundup, called Judge Neely, but she was unable to answer the call. When she called him back, Mr. Donovan identified himself as a reporter and “asked if [she] was excited to be able to start performing same-sex marriages.” Judge Neely responded that because of her religious beliefs she would not be able to perform same sex marriages. However, she affirmed that others could and would perform same sex marriages. Mr. Donovan wrote an article about the conversation, concluding “Neely, however, was clear that this does not stop any same sex couple in Pinedale from getting married in the town.” Judge Neely added that she had never been asked to perform a same sex marriage.
[¶84] About twenty minutes after that conversation, Judge Neely called Mr. Donovan back and asked that he substitute her earlier statements with the following: “When law and religion conflict, choices have to be made. I have not yet been asked to perform a same-sex marriage.” Mr. Donovan called Judge Neely back a few hours later and *755 offered to not publish a story if Judge Neely would state a willingness to perform same-sex marriages. Judge Neely declined, and on December 9, 2014, a local newspaper published an article written by Mr. Donovan which included Judge Neely’s statements from both conversations.
[¶85] No one ever asked Judge Neely to perform a same sex marriage, and Judge Neely never refused such a request.
[¶86] Under oath, Judge Neely said “if I ever were to receive a request to perform a same-sex marriage, which has never happened, I would ensure that the couple received the services that they requested by very kindly giving them the names and phone numbers of other magistrates who could perform their wedding.” Further, also under oath, Judge Neely stated that if any ease before her “would ever require me to recognize or afford rights based on a same-sex marriage ... I would unquestionably recognize that marriage and afford the litigant all the rights that flow from it.... I have never disputed the legality of same-sex marriage.”
[¶87] The record has no indication that any same sex couple has been denied or delayed marriage in Pinedale. Mr. Wood, who is able to perform marriages as a district court commissioner and as a circuit court magistrate, states “there is no shortage of public officials in Pinedale or Sublette County willing to officiate at same-sex wedding ceremonies.” He indicated that he is willing to perform such marriages and has done so.
DISCUSSION
[¶88] Accusations that a judge violated the Code of Judicial Conduct are akin to criminal charges, and the most serious incriminations that-can be leveled at a judge. Analysis of whether a judge violated a specific rule in the Code should be exact, just as it is with criminal charges. The public can be confident in its judiciary only if the Code is accurately applied to every judge, without watering down the requirements therein, but also without overreaching beyond the specific language in the rules.

1. Did Judge Neely violate Rule 1.1 of the Wyoming Code of Judicial Conduct?

[¶89] The majority opinion concludes that the record does not indicate that Judge Neely violated Rule 1.1.1 concur.
[¶90] Before specifically addressing the other Rules the majority finds Judge Neely violated, it is necessary to analyze exactly what “the law” requires of Judge Neely and other Wyoming judges with respect to officiating at marriages.
[¶91] The majority opinion asserts that Judge Neely failed or refused to follow the law as established in Guzzo v. Mead, No. 14-CV-SWS, 2014 WL 5317797 (D. Wyo. Oct. 17, 2014). Guzzo is clear about the law it establishes. It states:
Defendants (essentially State and County Officials) are hereby enjoined from enforcing or applying Wyoming Statute § 20-1-101, or any other state law, policy, or practice, as a basis to deny marriage to same-sex couples or to deny recognition of otherwise valid same-sex marriages entered into elsewhere. Marriage licenses may not be denied on the basis that the applicants are a same-sex couple.
Id. at 8.
[¶92] Giízzo established that Wyoming officials (which would include judges) may not deny marriage to same sex couples on the basis of any state law, policy or practice. It did not establish any law beyond this specific prohibition. It is clear from the undisputed facts that Judge Neely did not deny marriage to anyone, nor did she say she would deny marriage to anyone. Rather, she said that because of her religious beliefs, she would not perform same sex marriages herself, but would assist couples in finding a judge who would. Guzzo did not involve statements about religious beliefs in any manner. It did not involve any issue of who must perform same sex marriages. Guzzo certainly did not establish any requirement that any particular judge or level of judges in Wyoming must perform every marriage when requested. Similarly, it did not establish any right of same sex couples to insist that they be married by a particular judge.
*756 [¶93] In addition to Guzzo, the majority finds applicable law in the U.S. Supreme Court’s decision in Obergefell, — U.S.-, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015). That ease also is clear about the law it establishes (as it applies to the issues here). The Court stated “[t]he Constitution, however, does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex.” Id. at 2607. Obergefell did not establish any law about who must perform those marriages, but only said they must be available on the same terms as accorded to other couples. Because other couples. in Wyoming cannot insist that a particular judge or magistrate perform them wedding ceremony, it follows that same sex couples also have no right to do so. In Obergefell the U.S. Supreme Court made some other clear statements that apply to this case. It stated “[mjany who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor them beliefs are disparaged here.” Id. at 2602. It added:
Finally, it must be emphasized.that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to them lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.
Id. at 2607.
[¶94] The majority’s decision implies that the law requires Judge Neely to perform weddings, and that Judge Neely did not “follow” the law when she made the reported statements. Indeed, a key element in the majority opinion is an assumption that to follow the law Judge Neely was required to perform all marriages, or at least all same sex marriages, when requested. Neither Guz-zo nor Obergefell created such a requirement, Wyoming law does not contain such a requirement. Wyo. Stat. Ann. § 20-l-106(a) (LexisNexis 2015) governs who may perform marriages in Wyoming. It says:
Every district or circuit court judge, district court Commissioner, supreme court justice, magistrate and every licensed or ordained minister of the gospel, bishop, priest or rabbi, or other qualified person acting in accordance with traditions or rites for the solemnization of marriage of any religion, denomination or religious society, may perform the ceremony of marriage in this state.
[¶95] This statute indicates that many judges and religious officials may perform weddings, but it does not give that authority to municipal judges. Further, this statute states that certain judges and other individuals may perform the marriage ceremony, but it does not require any judge to do so. Nothing in any other statute or rale requires any particular judge or individual to perform a marriage ceremony.
[¶96] It cannot be argued that Judge Neely had an implied duty to perform marriages if asked. If there is an implied duty for circuit judges or circuit court magistrates to perform all weddings when requested, then there likewise is a duty for district court judges, Supreme Court justices, ministers, bishops, priests, rabbis and others. Of course, there simply is no such duty based on the plain language of § 20-1-106(a). The legislature, not this Court, wrote § 20-l-106(a) and determines who can perform marriages and whether any particular class of officiant is required to do so. It is not appropriate for this Court to attempt to re-write this statute. Horning v. Penrose Plumbing & Heating, Inc., 2014 WY 133, ¶ 18, 336 P.3d 151, 155 (Wyo. 2014) (‘We are not at liberty to rewrite a statute under the guise of statutory interpretation or impose a meaning beyond its unambiguous language.”).
[¶97] Further, nothing in Wyoming law or the record supports any express or implied requirement that if a judge decides to perform any weddings, he or she must perform every wedding. The record contains evidence that magistrates and judges decline to- perform legal marriages for a variety of reasons. Magistrates who perform some marriages decline to perform others because they have *757 family commitments, have other things to do, prefer to watch a football game, or prefer to perform weddings only for friends. Wyoming judges may or may not perform weddings without regard to the reason for their decision.
[¶98] Simply put, the law does not require any Wyoming judge, including part-time magistrate Neely, to perform any marriage ceremony.[17] The applicable law only requires that state officials may not “deny marriage to same-sex couples.”
[¶99] The evidence does not indicate that Judge Neely ever denied a same sex couple marriage. It does not indicate that Judge Neely ever said she would deny marriage to a same sex couple if asked. To the contrary, she clearly stated that she recognized their right to be married. Judge Neely did not hinder or delay any same sex couple seeking to be married, and she did not indicate any intent to do so. There simply is no evidence in the record indicating that Judge Neely failed to comply with the law or said she would not follow the law.

2. Did Judge Neely violate Rule 1.2 of the Wyoming Code of Judicial Conduct?

[¶100] Rule 1.2 of the Wyoming Code of Judicial Conduct states that “[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety,” The Code defines “impartiality” as “the absence of bias or prejudice in favor of, or against, particular parties or classes of parties.” Comment [5] to this rule states that “the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge’s honesty, impartiality, temperament or fitness to serve as a judge.”
[¶101] The majority opinion accepts the Commission’s recommendation on Rule 1.2. The Commission explained the basis for its conclusion that Judge Neely violated Rule 1.2 by stating:
Here, Judge Neely announced she would not follow the law because of her religious convictions regarding same sex marriage. By announcing her position against same sex marriage and her decision not to perform said, marriages, she has given the impression to the public that judges, sworn to uphold the law, may refuse to follow the law of the land. She has also suggested by her statements that other citizens may follow her lead. A judge announcing her decision to pick and choose the law she wishes to follow undermines her position and our system of justice,
[¶102] The majority’s position that Judge Neely violated Rule 1.2 is based on the mistaken conclusion that Judge Neely refused “to follow the law of the land.” As discussed above, the undisputed evidence shows that Judge Neely made no such refusal. She did not state that she would deny marriage to same sex couples, but rather said she would assist such couples in finding someone to perform their civil marriage ceremony. The law does not require Judge Neely personally to perform every marriage. There is no clear and convincing evidence in the record that she made a decision to “pick and choose the law she wishes to follow” or that she would “refuse to follow the law of the land.” As discussed above, the record is devoid of evidence that Judge Neely refused to follow any law. Nothing about what Judge Neely said remotely indicates that she will “pick and choose the law she wishes to follow.”
[¶103] The majority’s conclusion on Rule 1.2 is an overreach, just as the Commission’s position on Rule 1.1 was. The standards in *758 Rule 1.2 are vague, and require appropriate caution and reasonableness from the Court when applying them. Here the majority opinion goes “too far” in attempting to find appearances of impropriety or lack of independence. It concludes that Judge Neely’s statements erode public confidence in the judiciary without any evidentiary or logical support for that conclusion.
[¶104] To maintain public confidence in the judiciary, it is necessary to carefully apply vague rules like these. On the one hand, application of the standards “must be appropriately demanding to the end that justice is facilitated in eveiy possible way. At the same time the standards must ensure that the judges are not unnecessarily separated from the communities they seiwe in straitjackets of judicial isolation.” Robert B. McKay, The Judiciary and Nonjudicial Activities, 35 Law and Contemporary Problems L.J. 9 (1970). When the rule uses vague standards, such as those in Rule 1.2, “we must fear not only unreasonable discipline, but also discipline that produces an undesirable in terro-rem effect on judges’ moral and social lives.” Steven Lubet, Judicial Impropriety: Love, Friendship, Free Speech, and Other Intemperate Conduct, 1986 Ariz. L.J. 379, 399. The majority opinion does just that, by sending messages to both the public and judges that (1) eveiy Wyoming judge who is willing to perform any marriage must perform same sex marriages when requested or risk being found to have violated the WCJC, and (2) no person holding a sincere religious belief opposing same sex marriage may be a Wyoming judge who performs marriages.
[¶105] Rule 1.2 requires Judge Neely to act “in a manner that promotes confidence in the independence, integrity and impartiality of the Judiciary.” It further requires her to “avoid impropriety and the appearance of impropriety.” Whether Judge Neely violated this part of Rule 1.2 hinges on the perceptions of a reasonable member of the public, who must determine whether Judge Neely’s statements create an appearance of impropriety or undermine the public’s perception of her impartiality when deciding cases. The majority opinion appropriately notes Comment [5] to this rule which specifies that “the test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge’s honesty, impartiality, temperament, or fitness to serve as a judge.” Then, the majority concludes that clear and convincing evidence in the record would so persuade a reasonable person. The sole evidence the majority opinion uses to support its conclusion is “her stated refusal to conduct marriages for homosexuals.”
[¶106] Although the majority opinion claims otherwise, it applies its own, and the Commission’s, subjective test in concluding that Judge Neely violated Rule 1.2. This correct test is an objective one, not a subjective one. Arthur Garwin, et al, Annotated Model Code of Judicial Conduct, 61 (2d ed. 2011).
[¶107] The test for determining what constitutes “the appearance of impropriety” and what “promotes (or denigrates) confidence in the ... impartiality of the judiciary” necessarily must be an objective test based on what a rational person would think knowing all of the circumstances. The use of any lesser standard leads to absurd results. For example, the test cannot be whether some individual subjectively might be offended by what he or she heard or saw. Given the almost limitless capacity for people to take offense or feel “unwelcome,” this would put every judge constantly at risk of being brought before the Commission to face ethics charges. Similarly, the test cannot be based on what someone would think knowing only some of the circumstances. A rational person is not rational if he or she draws conclusions based on inadequate facts. Unhappy litigants always would be able to base claims of judicial impropriety or favoritism on just the portion of the facts that supported their side. Such subjective tests would seriously impair a judge’s ability to make independent decisions based on the facts and the law. The majority opinion is based on such a subjective analysis. It is based on a subjective thought that circuit court magistrates have a duty to perform marriages when requested (which they do not) and on a subjective *759 thought that someone hearing the misleading presentation of Judge Neely’s request to the advisory commission would question her impartiality.
[¶108] The “appearance of impropriety” and “promotes confidence in the ... impartiality of the judiciary” language in this rule is analogous to the language found in Rule 2.11 which governs disqualification of judges. Cases decided under both rules, and under corresponding federal statutes, indicate that a reasonable person would look at the particular facts of a case, and the totality of the circumstances when determining whether a judge’s actions adversely reflect on the judge’s impartiality. For example, Nebraska examines whether “a reasonable person who knew the circumstances of the case would question the judge’s impartiality under, an objective standard of reasonableness.” Tierney v. Four H Land Co. Ltd. P’ship, 281 Neb. 658, 798 N.W.2d 586, 592 (2011) (emphasis added). Alaska applies this principle by first viewing “all of the facts” in the judge’s favor, and then determining whether “the totality of the circumstances surrounding (the judge’s) decision ... create(d) an unmistakable appearance that something improper was afoot.” In re Johnstone, 2 P.3d 1226, 1236 (Alaska 2000). The 7th Circuit said that “the test for an appearance of partiality is, ..., whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case.” Pepsico, Inc. v. McMillen, 764 F.2d 458, 460 (7th Cir. 1985) (emphasis added). Mississippi held that “the test for impropriety is whether a judge’s impartiality might be questioned by a reasonable person knowing all the circumstances.” Mississippi Comm’n on Judicial Performance v. Boland, 975 So.2d 882, 895 (Miss. 2008) (emphasis added). The Pennsylvania Supreme Court capably expounded on the requirement that the reasonable person standard be based on a reasonable person with knowledge of all the facts and circumstances, and quoted former U.S. Chief Justice Rehnquist. It said:
We cannot agree, however, with the suggestion that the appearance be gauged as to a misinformed or uninformed hypothetical reasonable person. The absurdity of such a standard was ably and cogently exposed by, then, Justice Rehnquist- as follows: '
It is, of course, possible to interpret the phrase “appearance of impropriety” much more broadly and to suggest that it embraces a situation where the facts are only partially known, and where this partial version of the facts might rouse legitimate suspicion. Suppose, for example, that it was known only that Judge Haynsworth had some stock in the litigant, without it being known how miniscule his interest was? But this interpretation would cut. so broadly as to prevent a judge named Jones from presiding at the trial of a defendant named Jones, even though they were totally unrelated, since it would be possible from simply reading the docket entries to conclude that they were related to one another. It will not do.
Rehnquist, supra, 28 The Record at 701. (Emphasis added).
Indeed, if appearances were gauged without reference to the full and true facts, then false appearances of impropriety could be manufactured with ease by anyone with personal or political animus toward a judge. If such were the ease, then the hope of an independent judiciary would have been less than an evanescent dream, it would have been cruel charade and a dangerous snare for an ethical and unsuspecting judiciary.
Fortunately, our ease law is squarely to the contrary. In In re Greenberg (II), 457 Pa. 33, 318 A.2d 740 (1974), our Supreme Court stated succinctly, “it is our duty to consider the totality of the circumstances when determining questions pertaining to professional and judicial discipline.” 318 A.2d at 741. (Emphasis added).
Numerous cases would undoubtedly have been decided differently if the totality of the circumstances were not considered, and instead the Board and our Supreme Court applied a reasonable mis informed or un informed person standard. A judge’s acceptance of a gift from a union leader *760 might create a distinct appearance of impropriety, if our hypothetical reasonable un informed person did not know of their long familial association, or that the judge had systematically recused himself from any case known to involve a member of the gift donor’s union. See Matter of Braig, supra. Likewise, an appearance of impropriety might certainly appear if one had neither the benefit of the respondent’s version of disputed facts, nor knowledge of the respondent’s excellent reputation as an ethical individual and respected jurist. See Matter of Sylvester, supra. Moreover, an appearance of impropriety might certainly appear in hindsight based upon facts not known at the time of a judge’s challenged conduct, or based upon only one version of disputed facts, which would not appear if the limits of the judge’s information at the time of the conduct and the other side of the story were considered. See Matter of Johnson, supra.
In re Larsen, 532 Pa. 326, 433-34, 616 A.2d 529, 583 (1992)
[¶109] A reasonable person with knowledge of all the facts would know that Judge Neely was never asked to perform a same sex marriage, and had never refused such a request. He or she would know that all who work with her have expressed unreserved confidence that she will be absolutely fair and impartial to all litigants, whatever their sexual preference. Such a reasonable person would know that Wyoming law does not require Judge Neely to perform any marriage. He or she would know that the law prohibits judges and other public officials in Wyoming from denying marriage to same sex couples, and no same sex couple has been denied marriage by or because of Judge Neely’s statements. Further, a reasonable person would know that there is no indication that any same sex couple is likely to be denied or delayed in obtaining a civil marriage because of Judge Neely’s statements or religious beliefs. A reasonable person would know that if asked to perform such a marriage, Judge Neely would assist in finding an appropriate officiant, and that there is no shortage of such officiants. A reasonable person, apprised of these facts, could not conclude that Judge Neely’s statements gave the appearance of impropriety nor that they eroded public confidence in the impartiality of the judiciary. To the contrary, a reasonable mind would conclude, as Ms. Anderson did, “it would be obscene and offensive to discipline Judge Neely for her statement ... about her religious beliefs regarding marriage.”
[¶110] Rule 1.2 presents an important requirement that judges act in a manner which promotes public confidence in the judiciary. The record in this case indicates that Judge Neely did just that—she promoted confidence in the integrity and impartiality of the judiciary. Based on Judge Neely’s statements, the public in Wyoming can be confident that Judge Neely does not intend to “pick and choose” which law she wants to follow, but, rather, she will comply with the law about same sex marriage. She would not work against or frustrate a requested same-sex marriage. Based on Judge Neely’s statements, the public in Wyoming can be confident that she respects and treats every person before her court fairly, and is not biased.
[¶111] The record does not contain clear and convincing evidence that Judge Neely violated Rule 1.2.
3. Did Judge Neely violate Rule 2.2 of the Wyoming Code of Judicial Conduct?
[¶112] The majority opinion concludes that Judge Neely also violated Rule 2.2. That rule states “[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially.” The majority believes Judge Neely expressed intent to act unfairly because it finds “she is willing to do that (perform marriages) for one class of people (opposite-sex couples), but not for another (same-sex couples).” However, the record does not show that Judge Neely would perform all marriages for any class of people.
[¶113] The majority position ignores the plain language of this -rule. The rule, by its terms, applies only to actions, not to statements made outside the context of a case or an actual request. The words “uphold,” “apply” and “perform” all relate to action or deliberate inaction by a judge. They simply cannot apply to a judge’s statement about *761 how her religious views would come into play in the event at some unknown, future time, some unknown same sex couple insisted that Judge Neely, rather than someone else, perform their marriage. Although the majority claims that this “action against Judge Neely is a response to her deeds, not her faith,” the opposite is true. Judge Neely took no action, and was never involved in a “deed” which denied anyone a marriage.
[¶114] Furthermore, the rule requires judges to perform “duties” fairly and impartially. As discussed above, no judge in Wyoming has a duty to perform any particular marriage. Because no couple seeking marriage has a right in Wyoming to insist that a particular judge perform the ceremony, it is not “unfair” or “partial” for Judge Neely to arrange for some other judge to officiate for a same sex couple. Using the majority logic about this rule it would be a violation of Rule 2.2 fairness and impartiality for any judge to decline to perform a wedding if they would perform a wedding for anyone else. The majority position creates a requirement that does not exist in Wyoming—that judges who perform some marriages must perform all marriages.[18]
[¶115] If the law, or Judge Neely’s job description, required her to perform every marriage when requested, and if a same sex couple actually demanded that she perform their marriage ceremony, and if Judge Neely then denied them a civil marriage ceremony, then she may have violated Rule 2.2. However, none of those facts exist here.
[¶116] Guzzo established a “duty” for state officials in the negative sense—they may not deny marriage to same sex couples. Even if Judge Neely’s statements were seen as actions subject to Rule 2.2, she did not indicate she would violate that duty or carry it out unfairly with bias. Based on those statements, every couple requesting to be married would receive a marriage, no matter what their gender or sexual preference. Because there is no legal difference between marriage ceremonies conducted by one judge as opposed to another, and because no law permits any couple to insist that a particular judge or magistrate or clergy perform their marriage ceremony, Judge Neely’s statements do not indicate any lack of fairness or impartiality. The record does not contain clear and convincing evidence that Judge Neely violated Rule 2.2 by her statements.
4. Did Judge Neely violate Rule 2.3(B) of the Wyoming Code of Judicial Conduct?
[¶117] Rule 2.3(A) states “a judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.” The Commission did not find that Judge Neely violated Rule 2.3(A), apparently recognizing that this rule applies to actions as opposed to statements about what would occur in hypothetical circumstances. The majority and the Commission, however, conclude that clear and convincing evidence indicates Judge Neely violated Rule 2.3(B), which states:
A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the Judge’s direction and control to do so.
[¶118] Analysis of whether Judge Neely’s statements violated Rule 2.3 requires accurate definitions of the terms “bias” and “prejudice.” We have generally defined bias as “a leaning of the mind or an inclination toward one person over another.” “The ‘bias’ ... must be personal, and it must be such a condition of the mind which sways judgment and renders the judge unable to exercise his functions impartially in a given ease or which is inconsistent with a state of mind fully open to the conviction which evidence might produce.” Eaton v. State, 2008 WY 97, ¶ 78, 192 *762 P.3d 36, 73 (Wyo. 2008); Brown v. Avery, 850 P.2d 612, 616 (Wyo. 1993).
[¶119] W.R.C.P. 40.1(b)(2)(E) uses these same terms in defining when a judge is disqualified from sitting on a case “for cause.”[19] We defined bias and prejudice as used in that rule as: “Prejudice involves a prejudgment or forming of an opinion without sufficient knowledge or examination. Bias is a leaning of the mind or an inclination toward one person over another. The “bias’ which is a ground for disqualification of a judge must be personal.” TZ Land & Cattle Co. v. Condict, 795 P.2d 1204, 1211 (Wyo. 1990), quoting Cline v. Sawyer, 600 P.2d 725, 729 (Wyo. 1979). To find bias or prejudice resulting in disqualification of a judge, “[sjuch conditions must exist which reflect prejudgment of the case by the judge or a leaning of his mind in favor of one party to the extent that his decision in the matter is based on grounds other than the evidence placed before him.” Id., quoting Pote v. State, 733 P.2d 1018, 1021 (Wyo. 1987).
[11120] Using these definitions, Judge Neely would have manifested bias if her statements demonstrated an inclination of her mind toward one person over another in such a manner that sways her judgment and renders her unable to exercise her functions impartially in a given case. She would have manifested prejudice if she engaged in prejudgment or forming of an opinion without sufficient knowledge or examination.
[11121] Judge Neely’s statements contain no indication of bias or prejudice under these definitions. The statements are only an indication of her religious belief about marriage. They do not demonstrate any inclination of Judge Neely’s mind for or against persons in same sex relationships. To the contrary, Judge Neely said that she would assist such a couple in finding an officiant, and that she would treat them the same as any other person in any court proceeding. Nothing in her statements indicates a prejudgment or inclination against persons in same sex relationships.
[11122] A judge is guilty of expressing bias or prejudice by statements which denigrate the human value or standing of a person based on the fact that they fit within a particular class of persons. Comment [2] to Rule 2.3 gives examples: “epithets; slurs; demeaning nicknames; negative stereotyping; attempted humor based upon stereotypes; threatening, intimidating, or hostile acts; suggestions of connections between race, ethnicity, or nationality and crime; and irrelevant references to personal characteristics.” Such statements truly do “impair the fairness of the proceeding and bring the judiciary into disrepute.” Comment [1] to Rule 2.3. However, Judge Neely’s statements did not include any indication of such denigration. To the contrary, Judge Neely’s statements and all the other evidence in the record indicate that Judge Neely does not and will not engage in bias or prejudice in any judicial proceeding.
[¶123] The record does not contain clear and convincing evidence that Judge Neely violated Rule 2.3(B).
[¶124] The Commission asserted that because Judge Neely’s religious beliefs oppose same sex marriage, she necessarily is biased and prejudiced against persons who might be in a same sex marriage or relationship. Likewise, the majority opinion states that “Judge Neely’s refusal to perform same sex marriages exhibits bias and prejudice toward homosexuals.” There simply is no logic supporting this position. Judge Neely’s religious belief about who may be married has no relationship to her view of the worth of any individual or class of individuals. The overwhelming evidence in the recoi’d indicates that Judge Neely does not hold any bias or prejudice against any person or class of persons.
[11125] The majority opinion hinges on its conclusions that Judge Neely’s statements would cause reasonable persons to question her impartiality, and would conclude she exhibited bias and prejudice toward homosexuals. Those are not conclusions that would be *763 reached by a reasonable person apprised of the appropriate facts.
5. The Wyoming and U.S. Constitutions
[¶126] In addition to carefully analyzing the specific Rules in the WCJC that have been applied to this case, it is appropriate to review relevant portions of the Wyoming and U.S. Constitutions. Any construction and analysis of the Rules should be done in a manner consistent with those Constitutional provisions.
[¶127] Wyoming has a rich foundation for and history of protecting both free speech, equality before the law, and religious freedom. Article 1 of the Wyoming Constitution enumerates individual rights that our state government must respect, including the following:
§ 2. Equality of all. In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal.
§ 3. Equal political rights. Since equality in the enjoyment of natural and civil rights is only made sure through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever....
§ 18. Religious liberty. The free exercise and enjoyment of religious profession and worship without discrimination or preference shall be forever guaranteed in this state, and no person shall be rendered incompetent to hold any office of trust or profit, or to serve as a witness or juror, because of his opinion on any matter of religious belief whatever; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state.
§ 20. Freedom of speech.... Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; ....
[11128] Other portions of the Wyoming Constitution also address civil and religious freedom:
Preamble. We, the people of the State of Wyoming, grateful to God for our civil, political and religious liberties, and desiring to secure them to ourselves and perpetuate them to our posterity, do ordain and establish this Constitution.
Ordinances. The following article [sections] shall be irrevocable without the consent of the United States and the people of this state:
Art. 21, § 25. Religious liberty. Perfect toleration of religious sentiment shall be secured, and no inhabitant of this state shall ever be molested in person or property on account of his or her mode of religious worship.
[1J129] The U.S. Constitution includes well-known protections for equality and individual freedoms:
Amendment 1. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.
Amendment 14, Section 1. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
[¶130] Each of these enumerations of individual rights is vitally important to us. Together, they recognize the value of every person, and confirm that free individuals are the essence of our society. If any of these individual rights is diminished, individual value and freedom are diminished. If any of these individual rights is diminished, the public’s confidence in the judiciary is at risk. Judges, along with every other person, enjoy each of these constitutional rights.
[¶131] The Obergefell and Guzzo decisions are based on equality and equal protection. The majority opinion is based on an assumption that to carry out Obergefell and Guzzo, other individual rights, including religious liberty and freedom of speech, must be cur *764 tailed. The majority opinion states that we must choose between public confidence in the judiciary by implementing Obergefell and Guzzo, and recognizing constitutionally guaranteed rights to free exercise of religion and speech. Analysis of these constitutional principles, however,' shows that Wyoming, the Equality State, can equally recognize each of these individual rights. It is not appropriate, nor necessary, to diminish religious liberty or free speech in Wyoming .to accomplish protection of individual rights connected with same sex marriage, or to assure the integrity of the judiciary.
A. Article 1, § 18 of the Wyoming Constitution.
[¶132] The Wyoming Constitution is particularly strong in its protection of religious freedom. The Constitution’s preamble identifies religious liberty as a motivation for establishing the Constitution. Article 21, § 25 of our Constitution reaffirms the right to religious freedom, and includes that right with the most security, providing that it could only be repealed with the consent of Congress. In addition, the primary guarantee of religious liberty in Wyoming, Article 1, § 18, is almost unique among the states in its strength. It is located in the Declaration of Rights section of the Constitution, which requires that it be construed liberally to protect individual liberty. Vasquez v. State, 990 P.2d 476, 485 (Wyo. 1999) (quoting Robert B. Keiter and Tim Newcomb, The Wyoming State Constitution, A Reference Guide 11-12 (1993)).
[¶133] Article 1, § 18 establishes several very specific, strong principles which are applicable to this case. It begins by stating that “the free exercise and enjoyment of religious profession” shall be “forever guaranteed in this state.” It guarantees that any person can hold “any office of trust” regardless of “his opinion • on any matter of religious belief whatever.” Finally, this section restricts limitations on religious freedom in Wyoming to very specific, narrow; circumstances.
[¶134] Four aspects of this constitutional language are noteworthy. First, by guaranteeing “the free exercise” of religion, this provision of the Wyoming Constitution protects not just religious beliefs, but the exercise of those beliefs through action and abstention. In re LePage, 18 P.3d 1177, 1181 (Wyo. 2001). The “exercise of religion” includes “the performance of (or abstention from) physical acts.” Employment Div. v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).
[¶135] Second, unlike the U.S. free exercise clause, which simply attempts to restrain governmental action, Wyoming’s Constitution expressly grants affirmative rights to the free exercise of religion. While the federal constitution restricts government from prohibiting religious exercise, the Wyoming Constitution “forever guarantees” freedom of religious exercise.
[¶136] Third, this statement in our Constitution goes far beyond the U.S. Constitution in protecting service in public office. While Article VI of the U.S. Constitution bans “religious test[s]” for public office, our Constitution prohibits any government action that renders any person incompetent from holding “any office of trust” based on “any matter of religious belief whatever.” (Emphasis added). In Wyoming, persons are protected not just from the narrow test oaths often imposed when our country was founded, but from any type of disqualification from office based on religion.
[¶137] Finally, our Constitution states that guarantees of religious freedom are limited only in that they cannot justify “acts of licentiousness” or a threat to “the peace or safety of the state.” This portion of Article 1, § 18 shows that the guarantee of free exercise of religion in Wyoming is not limited to belief and expression, but includes actions or abstention. Otherwise, there would have been no need to state that some actions are not protected. Further,- when this last statement in Article 1, § 18 specifies that certain “permissible countervailing interests of the government” may “outweigh religious liberty,” the possibility that other interests might also outweigh religious liberty is foreclosed. See State v. Hershberger, 462 N.W.2d 393, 397 (Minn. 1990) (construing identical language).
[¶138] The history and proceedings of our state’s constitutional convention are “a valu *765 able aid in interpreting the scope of a provision of the state constitution.” Dworkin v. L.F.P., Inc., 839 P.2d 903, 910 (Wyo. 1992). Before adopting the broad free exercise provision we have in our Constitution, the Wyoming constitutional convention rejected much weaker language, which limited protection of religious freedom to “matters of religious sentiment, belief, and worship,” and which protected public officeholders solely from being forced to meet “religious qualification[s].” Journal - and Debates of the Constitutional Convention of the State of Wyoming 168. Clearly, Article 1, § 18 provides greater protection than what was included in the rejected language.
[¶139] The majority opinion finds that Article 1, § 18 does not apply here because, it claims, its decision is not based in any manner on Judge Neely’s religious beliefs, but instead on her unwillingness to do what the majority opinion perceives is her duty as a magistrate. The majority opinion states “the action against Judge Neely is in response to her deeds, not her faith.”
[¶140] The record is clear, however, that Judge Neely only made statements—nothing more. Everything Judge- Neely said is based solely and entirely on her sincerely held religious belief. Her statement that if asked, she would decline personally to officiate at a same sex marriage but would find someone else who would do so is exclusively an expression of her opinion on a matter of religious belief. In spite of the claims to the contrary, it is clear from the record that the majority opinion (and the Commission’s recommendation) holds her “incompetent to hold ... office” because of her expression of her “opinion on ... [a] matter of religious belief.” The office of circuit court magistrate includes the authority to perform marriages. The result in this case holds Judge Neely incompetent to hold that function of office unless she compromises her religious convictions. The conclusions of the majority chip away at the heart of Article 1, § 18 of the Wyoming Constitution.
[¶141] Further, the majority’s claim that findings against Judge Neely are based on her inability to apply and follow the law and on her display of bias rather than on her religious beliefs is not supported by the law or the record. The ■ law does not require Judge Neely to perform any particular wedding ceremony, and she has never denied or -hindered a same sex marriage in any way. If the law required Judge Neely, as a magistrate, to personally perform every marriage when asked, even allowing for scheduling difficulties, and if someone actually attempted to force her to .personally perform their marriage rather than having a different officiant, -or if she refused to perform same sex marriages because-she held personal animosity or disrespect for the parties, then the claims against Judge Neely might have substance. None of those facts exist here.
[¶142] Article 1, § 18’s protection of the free exercise and enjoyment of religious profession is very broad, but does not apply to “acts of licentiousness” or “practices inconsistent with the peace or safety of the state.” The record is devoid of even any hint that Judge Neely’s expressions constituted “acts of licentiousness” or were “inconsistent with the peace or safety of the state.” Wyoming’s Constitution (and the U.S. Constitution) guarantees the free exercise of religion, not just the freedom to “believe.” It cannot seriously be argued that Judge Neely was free to believe what she wanted, but that the state is permitted to prohibit her from acting consistently with that belief. Under our Constitution the state may restrict her actions based on religious beliefs only when they are “licentious” or “inconsistent-with the peace or safety of the state.” Under the U.S. Constitution, government can restrict religiously motivated action only where there is a compelling-state interest and the state utilizes the least restrictive means to support that interest (as discussed below).
[¶143] The effect of the majority opinion is concerning for the people of Wyoming. It likely results in a religious test for who may be a judge, at any level, in our state. There is only a single statute granting judges and others the authority to perform marriages in Wyoming. Apparently from that statutory authority the majority concludes that a circuit court magistrate who is willing to perform any marriages must perform all same sex marriages when requested. If such a *766 duty exists for circuit court magistrates, it exists for all other judges as well. To avoid ethics charges like these, judges then must pass a religious test indicating that they have no religious beliefs that would prevent them from performing same sex marriages, or be precluded from performing any marriages. The record points out, and Obergefell confirms, that a significant portion .of our country holds sincere religious views against same sex marriage. The majority position likely would exclude a significant portion of our citizens from the judiciary, without- any compelling reason to do so.
[¶144] In addition, the majority opinion is concerning for Wyoming in its treatment of constitutional protections for the free exercise of religion. It finds justification to entirely restrict Judge Neely's “exercise” of her religious beliefs because the majority opinion believes someone might question her independence or impartiality, although the evidence does not support such a conclusion. This reduces the constitutional guarantee of a robust principle—“free exercise”—to a minimal “free belief.”
B. Amendment I to U.S. Constitution.
[¶145] Free exercise of religion. Although the Wyoming Constitution includes stronger freedom of religion language than the U.S. Constitution does, it is appropriate to consider some principles developed under the First Amendment in the context of this case. The U.S. Constitution essentially provides that no government may make or enforce a law which prohibits the free exercise of religion.
[¶146] Both sides agree that this Court should apply the strict scrutiny standard when considering the U.S. constitutional ramifications of the Commission’s recommendations and findings. Strict scrutiny is used to determine whether a state’s actions which impinge on constitutional rights such as free speech or free exercise of religion may stand, or whether they prohibit the free exercise of religion. To pass strict scrutiny, a state or state actor must “demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest.” City of Boerne v. Flores, 521 U.S. 507, 534, 117 S.Ct. 2157, 2171, 138 L.Ed.2d 624 (1997). Strict scrutiny is the “most demanding test known to constitutional law.” Id.; Williams-Yulee v. Florida Bar, — U.S. -, 135 S.Ct. 1656, 191 L.Ed.2d 570 (2015); Rep. Party of Minn. v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed. 2d 694 (2002). The majority opinion clearly impinges on Judge Neely’s right to free exercise of religion (and free speech). Consequently, because of the strict scrutiny standard, the majority opinion’s ban of Judge Neely from performing any marriage is constitutionally valid only if it is the “least restrictive means” of achieving a “compelling state interest.” Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); accord Washakie County School District No. One v. Herschler, 606 P.2d 310, 333 (Wyo. 1980). One cannot make such a finding here.
[¶147] The majority opinion finds that there is a compelling state interest in protecting same-sex couples from the perception of bias and partiality, and in fostering public confidence in the judiciary by requiring judges to perfonn all same sex marriages if they perform any marriages. While the state does have a compelling interest in assuring that judges follow the law, no law in Wyoming requires a particular magistrate to perform a particular wedding. No law permits couples to insist that a particular judge or magistrate (or religious official) perform a wedding for them. As discussed above, Judge Neely did not fail or refuse to comply with any law. This is not a case like Miller v. Davis, 123 F.Supp.3d 924 (E.D. Ky. 2015), where the state specifically required a county clerk to issue marriage licenses, nor is it like Moore v. Judicial Inquiry Commission, 891 So.2d 848 (Ala. 2004), where a judge was accused of refusing to comply with specific requirements in a court order. This is not a ease like those cited in the majority opinion where police officers refused to follow instructions to protect abortion clinics or gambling establishments. In those cases there was an absolute duty which the officers refused to perform. That is not the ease here. Absolutely nothing in the record indicates that Judge Neely failed or refused to comply with the law. The Commission’s findings and *767 recommendations, therefore, are not supported by the state’s interest in insuring that judges follow the law.
[¶148] The state also has an interest in assuring that judges do not give valid cause for reasonable persons to question the judge’s impartiality. That interest is broad and vaguely stated, and logically unrelated to the actual facts in this case. Strict scrutiny requires us to “looked beyond broadly formulated interests justifying the general applicability of government mandates and seruti-nize[e] the asserted harm of granting specific exemptions to particular religious claimants.” Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 430-31, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). Here, there is no evidence in the record proving that the interest in promoting public confidence in the judiciary is threatened by Judge Neely’s statements.
[¶149] Apparently some individuals might find it offensive that Judge Neely said she would decline to personally perform a same-sex marriage and instead would refer them to someone else. There is no compelling state interest in shielding individuals from taking such an offense. A “bedrock principle underlying the First Amendment” is that “the government may not prohibit the expression of an idea simply because society finds the idea itself offensive.” Snyder v. Phelps, 562 U.S. 443, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011). “Government may neither compel affirmation of a repugnant belief, nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities.” Sherbert v. Verner, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963).[20]
[¶150] The state has a compelling interest in assuring that every person is treated equally and that judges do not display bias or prejudice. This interest comes into play when a judge demonstrates actual bias or partiality. Nothing in the record indicates any bias or prejudice on the part of Judge Neely, so the majority opinion cannot be supported on the basis of this state interest. To assure that judges do not display bias or partiality, our rules permit a judge to assign a particular case to another judge. That is just what Judge Neely proposed to do. Her proposal to refer same sex marriages to another judge cannot be a demonstration of bias, absent any obligation to personally perform such wedding ceremonies.
[¶151] Even if Judge Neely violated a compelling state interest in providing same sex marriages, to protect her constitutional rights the law requires the Commission to recommend or the Court to find the least restrictive alternative to accomplish that interest. If a less restrictive alternative would serve the government’s purpose, “the legislature must use that alternative.” U.S. v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). To make this showing, the government must “prove” that no other approach will work, id at 816, 120 S.Ct. 1878, and must “refute .., alternative schemes suggested by the plaintiff.” Yellowbear v. Lampert, 741 F.3d 48, 62 (10th Cir. 2014). The record does not show that anyone has been denied same sex marriage in Wyoming since Guzzo and it does show there are sufficient persons available to perform same sex marriages in Judge Neely’s jurisdiction. The remedy of prohibiting her from performing any marriages is entirely unnecessary to see that the dictates of Guzzo are carried out. The majority opinion claims that letting Judge Neely “opt out” of same sex marriages would not work because it conflicts with the interests of the state in having an impartial judiciary and could result in no judge who was willing to perform same sex marriages. The evidence shows otherwise. Further, the availability of marriage officiants is an issue for the legislature, not this Court nor the WCJCE.
[¶152] Similarly, if Judge Neely violated a compelling state interest in assuring the appearance of impartiality, the state simply could require what Judge Neely already stat *768 ed her intention to do—find another judge to handle same sex marriages.
C. Free Speech.
[¶153] Both the Wyoming and the U.S. Constitution guarantee free speech. Just as with freedom of religion, when a government action prohibits or punishes free expression, strict scrutiny applies. In that event, the government must show that it narrowly tailored a solution to serve a compelling state interest.
[¶154] Judges subject to disciplinary claims have full protection of the First Amendment, Strict scrutiny is applied to a judge’s free speech claims in circumstances like this. Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002); Mississippi Commission on Judicial Performance v. Wilkerson, 876 So.2d 1006 (Miss. 2004); In re Sanders, 135 Wash.2d 175, 955 P.2d 369 (1998). “Applying a lesser standard of scrutiny to such speech would threaten ‘the exercise of rights so vital to the maintenance of democratic institutions.’ ” Williams-Yulee v. Florida Bar, — U.S. -, 135 S.Ct. 1656, 1665, 191 L.Ed.2d 570 (2015).
[¶155] The White case provides an appropriate analysis of a judge’s free speech claim in a case like Judge Neely’s:
In Republican Party of Minnesota v. White, Justice Scalia, writing for five members of the Court, held that [a Minnesota rule of judicial ethics prohibiting judicial candidates from “announcing” a view on any disputed legal or political issue if the issue might come before a court] violates the First Amendment. In order for the announce clause to survive strict scrutiny, it must be narrowly tailored to serve a compelling state interest. And, in order to be nawowly tailored, it must not “unnecessarily cireumscrib[e] protected expression.” The Minnesota rule did not meet this rigorous test. The announce clause was not narrowly tailored to promote “impartiality,” in the sense of no bias for or against any party to the proceeding because it did not restrict speech for or against particular parties, but rather speech for or against particular issues. If the state meant to promote “impartiality” in the sense of no preconception for or against a particular legal view, that is not a compelling state interest, the Court said, because it is both “virtually impossible,” and also not desirable, to find a judge who does not have preconceptions about the law.
Ronald D. Rotunda, Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party of Minnesota v. White, Ca-perton, and Citizens United, 64 Ark. L.Rev. 1, 36 (2011).
[¶156] The principles identified in White apply here. The definition of impartiality in the majority opinion leads not to trae impartiality but to forced agreement with a particular idea. White recognizes that the impartiality pursued by the majority opinion, seeking “no preconception” against same sex marriage even on the basis of religious belief, is not a compelling state interest, The state does have a compelling interest in assuring that judges do not actually have bias against a particular party, but that is not the interest involved in this case. Judge Neely never exhibited any bias against a particular party. Furthermore, if she had any bias against a particular party, the most narrowly tailored remedy would be to find another judge to perform the wedding—exactly what Judge Neely proposed to do. Discipline against Judge Neely for her statements cannot withstand strict scrutiny as outlined in White.
[¶157] The majority opinion asserts that this case is distinguishable from White because Judge Neely did not only “announce” her position about same sex marriage, she said she would be unable to perform those marriages and would assist in finding someone who could. The majority opinion concludes that her statement goes beyond a statement and constitutes action. It is obvious, however, that all Judge Neely did was “announce” her position. Taking that position publicly is precisely what the majority opinion sanctions her for.
[¶158] The majority opinion also claims that White is distinguishable because “the rules she has violated are far more well *769 established than the announce clause at issue in White.” That certainly is not the case. Application of Rules 1.1, 1.2, 2.2 and 2.3 to situations like this is not established at all.
[¶159] The strict serutiny/eompelling state interest analysis discussed above for Judge Neely’s right to free exercise of religion applies equally to her right of free speech. Although the state has compelling interests in assuring that judges follow the law and are unbiased, the evidence here does not show that Judge Neely failed to do follow the law or is biased. Interference with Judge Neely’s right of free speech is not justified by any compelling state interest.
CONCLUSION
[¶160] There is no clear and convincing evidence that Judge Neely violated any of the rules of the Wyoming Code of Judicial Conduct. Wyoming law does not require any judge or magistrate to perform any particular marriage, and couples seeking to be married have no right to insist on a particular official as the officiant of their wedding. Judge Neely did not state she could “pick and choose” which law she wanted to follow, and her statements do not encourage that.
[¶161] In our pluralistic society, the law should not be used to coerce ideological conformity. Rather, on deeply contested moral issues, the law should “create a society in which both sides can live their own values.” Douglas Laycoek, Religious Liberty and the Culture Wars, 2014 U. Ill. L.Rev. 839, 877 (2014). That is precisely how Wyoming has approached the matter since its founding.
[¶162] The Obergefell decision affirms this approach for the issue of same sex marriage. It emphasized that the constitutional problem arose not from the multiplicity of good faith views about marriage, but from the enshrining of a single view into law which excluded those who did not accept it as “outlaw[s]” and “outeast[s]”. Id., 135 S.Ct. at 2600, 2602. Unfortunately, the majority opinion does just that for Judge Neely and others who share her views. Caring, competent, respected, and impartial individuals like Judge Neely should not be excluded from full participation in the judiciary. Judge Neely’s friends who actually obtained a same sex marriage recognized this and observed that it is “obscene” to impose discipline in this case.
[¶163] There is no cause for discipline in this case, nor for concern if Judge Neely is not disciplined or precluded from performing marriages. Same sex couples have full access to marriage, all persons before the courts can be certain of an unbiased and impartial judiciary, and religious individuals ¿an remain in public office even if they hold a traditional religious view .of marriage. Judicial positions are filled without either side insisting on a religious test for who may serve. There is room enough in Wyoming for both sides to live according to their respective views of sex, marriage and religion.
[¶164] I respectfully dissent, and would find that Judge Neely did not violate the Wyoming Code of Judicial Conduct.

. No other state court has decided this issue. The Washington Commission on Judicial Conduct decided a case consistent with the majority opinion, and advisory committees in Arizona, Nebraska, Wisconsin, Pennsylvania, and Ohio have given advisory opinions. None of those states have the same religious freedom provisions found in the Wyoming Constitution. As can be seen with the Wyoming Commission’s decision on Rule 1.1, Commission recommendations may or may not be correct, and are not precedent.

. Sound policy reasons support magistrates having discretion in exercising their marriage-celebrant authority. They are not paid by the state for performing marriages, but instead must negotiate their own fee with the participants. Magistrates are sometimes appointed to perform just a particular wedding—to act for their own private purposes. Unlike other functions of a magistrate, they personally participate in celebrating a private event Considering these factors, it makes sense that the legislature found it appropriate to authorize many levels of judges to perform weddings, while giving each judge the discretion to decide for or against participating in any specific wedding.

. The majority suggests that the results here are similar to the results in jury selection from Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which held that jurors could not be challenged solely on the basis of race or gender. There are many, many differences between the effect of Batson and the effect of the majority opinion.

. W.R.C.P. 40.1 recognizes that judges are human beings and may have personal biases and prejudices, When a judge has a bias or prejudice, the rule provides a means for the judge to be recused from that case, and assign the case to a different judge. The judge's bias or -prejudice, however, does not disqualify him or her from being a judge altogether.

. In footnote 12 the majority suggests that if some other type of religious belief were involved or if some other type of prospective married couple were involved there "would be little controversy regarding her (Judge Neely’s) discipline." Neither the hypothetical religion nor the hypothetical couple suggested by the majority are appropriately analogized to this case, and the assumed conclusion is likely incorrect.